STATE, Respondent, v. HOLMSTROM, Appellant. [Three cases.]

*Nos. State 129, 130, 131. Argued June 6, 1969.—Decided June 27, 1969.*
(Also reported in 168 N. W. 2d 574.)

466

For the appellant there were briefs and oral argument by *Jack McManus* of Madison.

For the respondent the cause was argued by *Betty R. Brown,* assistant attorney general, with whom on the brief were *Robert W. Warren,* attorney general, and *William A. Platz,* assistant attorney general.

HANLEY, J. This appeal presents three questions:

(1) Was the jury array in Eau Claire county improperly constituted;

(2) Was there sufficient credible evidence to support the jury's verdicts that the defendant was guilty of burglary and possession of burglarious tools; and

(3) Was the district attorney's conduct improper?

*Jury Array.*

Prior to the trial in this case, the defendant challenged the jury array in Eau Claire county on the ground that it did not represent a fair cross section of the entire community. The three jury commissioners and the clerk of the circuit court were called to testify. At the conclusion of the hearing, the trial court stated that:

". . . there is no showing there has been any discrimination as to race, age, politics, or occupation."

The trial court instead complimented the jury commissioners for their devotion to duty.

"We have the testimony of these three Jury Commissioners and I am rather impressed with one thing in their background and understanding and this is addiction to the responsibilities of their job so that the people of Eau Claire County and others who may have matters to be tried before a jury are having it tried before a jury properly picked pursuant to statute . . ."

The defendant insists that the jury array included only a few persons under forty-five years of age, that the vast majority of jurors had good jobs, and that only persons who wanted to serve as jurors were picked for the array.

The jury commissioners testified that no categorization of potential jurors was made in regard to age, race, religion, politics, or ethnic background. The commissioners all testified as to how they came up with the names of prospective jurors.

The first commissioner, George W. Fuller, stated that in his daily activities he observed persons of lawful age and good moral character, who could read and write; and he recommended these people as jurors. By using the census figures, the proper number of jurors was picked from each ward of the city of Eau Claire and from each of the towns, villages and cities in the county. Mr. Fuller admitted that very few people between the ages of twenty-five and thirty-five were on the jury panel. He

explained this by stating that jury service worked a financial hardship on young people with families and, in some cases, this factor was taken into consideration when recommendations concerning potential jurors were made.

Watford G. Sequin, Sr., testified that the commissioners made a point of picking jurors that represented a cross section of the industry in the community. He got the names of potential jurors from private conversations with his friends.

Victor Figlmiller testified that he relied on his own knowledge, as well as that of his friends and relatives, in picking people of good reputation as potential jurors. He did not pick names at random from any list.

The defendant contends that the system used by the jury commissioners in Eau Claire county practically eliminates the possibility of having poor people, young people or new members of the community on the jury. The defendant contends that only by categorizing persons regarding their sex, age, race, religion, politics, and occupation can a truly representative cross section of a community be picked.

In *State v. Bond* (1969), 41 Wis. 2d 219, 226, 163 N. W. 2d 601, the court pointed out that:

". . . A defendant challenging the validity of the jury array has the burden of establishing a prima facie case of discrimination. . . ."

Once the defendant presents a prima facie case of discrimination, the burden shifts to the prosecution. *Whitus v. Georgia* (1967), 385 U. S 545, 550, 87 Sup. Ct. 643, 17 L. Ed. 2d 599.

The tests which are to be applied in this area are well discussed in *United States v. Mirabal Carrion* (D. C. Puerto Rico 1956), 140 Fed. Supp. 226, where the defendant challenged the jury array for, among other things, not representing a financial, social and educational cross section of the community.

". . . It is well settled that before a jury panel can be quashed on the ground that a cohesive group has been excluded, there must be a clear showing of an intentional and systematic exclusion of said group . . . [citations omitted]. The Supreme Court has made it abundantly clear in a number of cases involving mostly exclusion of racial and economic groups that disproportion in the ultimate composition of an indicting grand jury furnishes no basis whatsoever for an inference of exclusion . . . [citations omitted]. Moreover, it is essential if a defendant is to succeed in a jury challenge, that it be shown that the group which is claimed to have been excluded is a cohesive one whose exclusion would defeat the constitutional requirements of a representative jury. . . ." *United States v. Mirabal Carrion, supra,* at pages 229 and 230.

The "clear showing" or prima facie case which the defendant is required to present is discussed in *Bailey v. Henslee* (D. C. Ark. 1960), 184 Fed. Supp. 298, 302:

". . . the discrimination alleged may be established by evidence showing disproportionate representation over such a period of time that the burden is shifted to the State to show that it is not the result of systematic limitation. . . ."

We conclude from the cases cited above that to succeed on a challenge to the jury array the defendant must show:

(1) A systematic exclusion;
(2) Of some representative unit of citizens.

A systematic exclusion can be shown by the direct testimony of the jury commissioners or by proving a disproportionate representation of a unit of citizens on the jury array over a period of time.

As far as defining what amounts to a cohesive unit of citizens, the United States Supreme Court has held that there should be no systematic exclusion of any

". . . economic, social, religious, racial, political . . . [or] geographical groups of the community . . . ." *Thiel v. Southern Pacific Co.* (1946), 328 U. S. 217, 220, 66 Sup. Ct. 984, 90 L. Ed. 1181.

In *Ballard v. United States* (1946), 329 U. S. 187, 67 Sup. Ct. 261, 91 L. Ed. 181, the majority also declared that it would be improper to systematically exclude women from the jury array.

We find no authority with reference to the systematic exclusion of young persons as prohibited discrimination. Nonetheless, we think systematic discrimination in regard to age would render the jury array just as defective as any other type of systematic discrimination. Within these guidelines then it is necessary to review the proof this defendant introduced in his challenge to the array.

The defendant subpoenaed the three jury commissioners in Eau Claire county. As the trial court noted, this testimony completely failed to establish any systematic exclusion of young people. At most this testimony showed that college students were generally not recommended as jurors because by the time they were called, they had graduated and left the county. Since most college students do not attain the age of twenty-one years until their last year of school, this type of exclusion is based on reason and common sense. Except for the reference to college students, the record simply does not support the statement that young people were systematically excluded as jurors. If anything, the testimony of the jury commissioners establishes just the opposite conclusion.

Aside from the testimony of the jury commissioners and the clerk of the circuit court, the only other evidence introduced by the defendant in his challenge to the jury array was the ages of the 20-man jury panel available for his case and the 1960 census report for Eau Claire county. This evidence simply does not amount to proof of a disproportionate representation of young people on the jury array over a period of time.

Since the defendant clearly did not present a prima facie case of discrimination, either as regards age or income, the trial court properly denied his motion to strike the array.

## Sufficiency of Evidence.

The defendant admits that there was sufficient evidence before the jury to convict him of the charge of carrying a concealed weapon, but he alleges that there was not sufficient evidence to permit the jury to find him guilty of burglary or possession of burglarious tools. In his brief the defendant relies upon the same reasoning which he did at trial: Nobody saw him in the building; no property was taken; and no burglarious tools were in his physical possession when he was arrested.

It will be best to consider the two charges individually. As far as the burglary charge is concerned, the defendant contends there is no evidence he entered the building; and even if he did enter the building, there is no evidence that he entered with an intent to steal or commit a felony therein.

In the first instance, it must be pointed out that the evidence presented by the state in this case was admittedly circumstantial. However, in *State v. Johnson* (1960), 11 Wis. 2d 130, 134, 104 N. W. 2d 379, the court stated that:

". . . Circumstantial evidence may be and often is stronger and as convincing as direct evidence. . . ."

The following was evidence which the jury was entitled to rely upon in this case:

(1) The defendant was seen just outside the premises on a balcony which could only be conveniently reached from inside the building;

(2) An alarm which could only be set off from inside the building was triggered;

(3) A door inside the premises had been damaged; and

(4) No other person was seen in the area.

The evidence was sufficient for the jury to conclude that the defendant entered the building beyond a reasonable doubt.

The second element of burglary which is disputed is whether the defendant entered the building with an intent to steal or commit a felony therein. The defendant argues that *State v. Kennedy* (1962), 15 Wis. 2d 600, 113 N. W. 2d 372, stands for the proposition that an entry into a structure is not sufficient to prove the intent necessary for a burglary conviction.

In the *Kennedy Case,* the defendant and two others were caught fleeing from a school building. Upon apprehension, one of Kennedy's confederates dropped a bag of tools. In a 4 to 3 decision, this court held that an intent to steal could not be inferred from a breaking and entering into a school building at night. The majority felt that the inference of intent to steal did not overcome the presumption of innocence.

In *Galloway v. State* (1966), 32 Wis. 2d 414, 145 N. W. 2d 761, 147 N. W. 2d 542, the court reconsidered the *Kennedy Case.* At that time the court concluded:

". . . one who breaks and enters without consent into a private dwelling or a private office may more readily be found to have a felonious intent than one who breaks and enters into a public building." *Galloway v. State, supra,* at page 422.

Even more recently, the court reconsidered the *Kennedy Case* in *Strait v. State* (1969), 41 Wis. 2d 552, 562, 164 N. W. 2d 505.

"It can be said as a verity that the intent most often associated with an unlawful entry of a building is an intent to steal. Crime statistics universally recognize it. An unauthorized person in your home or at your place of work or business during nonbusiness hours without a rational explanation usually creates a belief the person is there with the intent to steal. When apprehension or alarming interruption takes place before larceny is committed, proof of intent to steal must in most instances depend upon circumstantial evidence. When there is proof of an unlawful entry without consent of the person in lawful possession, in the absence of a rational explanation, proof of circumstances which would lead

the ordinary person to conclude beyond reasonable doubt that the entry was with the intent to steal is sufficient to sustain a finding of guilt.

"This opinion does not overrule *Kennedy* and *Reynolds* [2] which rejected mere intentional entry without consent of the person in lawful possession as enough to infer an intention to steal. It does, however, qualify these opinions to the extent that additional circumstances such as time, nature of place entered, method of entry, identity of the accused and other circumstances, without proof of actual larceny, can be sufficient to permit a reasonable person to conclude the defendant entered with an intent to steal."

We hold that the only part of the *Kennedy Case* which is not overruled is the statement that intent to steal will not be inferred from breaking and entering alone. On its facts, the *Kennedy Case* is overruled. We submit that if three men were seen running from a schoolhouse today, at night, in July, with gloves on, and carrying a bag of what is commonly referred to as burglarious tools, the jury would be entitled to infer that they entered the building with intent to steal.

Likewise, in this case the jury was entitled to conclude that the defendant entered the clubhouse with an intent to steal. The entry was forcible, at 2 a. m., and without consent. The door to the manager's office was damaged. The manager's office contained a safe. The defendant attempted to run. He was armed with a loaded pistol.

The circumstantial evidence is sufficient to sustain the jury's implicit finding of an intent to steal. It follows then that the conviction for burglary must be affirmed.

The defendant also contends that he did not have possession of burglarious tools. A duffel bag of tools was found between 50 and 60 feet from where the police first spotted the defendant. A pry bar was found on the

---

[2] *State v. Reynolds* (1965), 28 Wis. 2d 350, 137 N. W. 2d 14.

ground just a short way from the east balcony. Expert testimony established that the pry bar had been used to cause the damage to the north door where the entry had been gained to the premises.

Wis J I—Criminal, Part II, 1431, defines what is meant by possession as the term is used in relation to possession of burglarious tools.

". . . It is not necessary that the device or instrumentality be found upon the person of the defendant in order for it to be in his possession. The phrase 'in his possession' requires that the device or instrumentality be under the dominion or control of the defendant. . . ."

We approve of the above standard jury instruction.

There was sufficient credible evidence in the record for the jury to find beyond a reasonable doubt that the defendant possessed burglarious tools. It follows, therefore, that the conviction must be affirmed.

### District Attorney's Conduct.

The defendant alleges that certain conduct and comments of the district attorney prejudiced his defense. It would serve no useful purpose to detail the circumstances surrounding the numerous motions for mistrial made by the defense. It should suffice to say that the case was hard fought by both parties. The defense presented no witnesses, but sought to establish the incompetency of the "young" district attorney to the "folks" of the jury. The trial court denied each and every defense motion for a mistrial and gave the standard precautionary instruction on a few occasions.

In *Oseman v. State* (1966), 32 Wis. 2d 523, 528, 145 N. W. 2d 766, this court stated:

"The motion [for mistrial] is addressed to the discretion of the trial court and an appellate court will not reverse unless there has been abuse of discretion."

**478**

The evidence for conviction on all three charges in this case was overwhelming. We are not convinced, from reading the record, that the district attorney was guilty of any impropriety.

*By the Court.*—Judgment and order affirmed.