STATE of Wisconsin, Plaintiff-Respondent,

v.

Richard Lee PRUITT, Defendant-Appellant.†

Court of Appeals

*No. 79–055–CR. Argued October 24, 1979.—*
*Decided January 16, 1980.*
(Also reported in 289 N.W.2d 343.)

---

† Petition to review denied.

For the appellant, there was a brief submitted by *Miller, Hayes, Werner & Moir, S.C.* of Sheboygan, with oral argument by *William W. Moir III.*

For the respondent, there was a brief submitted by *Bronson C. La Follette,* attorney general and *David J. Becker,* assistant attorney general, with oral argument by *David J. Becker.*

Before Voss, P.J., Brown and Bode, JJ.

BODE, J.   Defendant Richard Lee Pruitt was found guilty by a jury of the first-degree murder of Christine Berg. On appeal, he challenges: (1) the constitutionality of the jury selection process in Sheboygan County, (2) the order of the trial court requiring the defense to make available to the State the report of a defense retained psychiatrist, (3) the refusal of the trial court to give the defendant's proposed instructions on first- and second-degree murder, expert testimony, and the defendant's theory of the case, and (4) the sufficiency of the evidence to support the conviction.

The defendant and the victim became engaged on December 2, 1977. The romance apparently soured, however. By April 7, 1978, the victim returned the engage-

ment ring to the defendant and announced her intention to move in with one Bruce Bowton. During the next few weeks, the defendant and the victim saw each other on several occasions to return gifts they had given each other.

Shortly after midnight on May 21, 1978, the defendant and the victim engaged in a loud and near-physical argument in the parking lot outside Bowton's apartment. Bowton ordered the defendant to leave. Before driving off, the defendant told Bowton, "I'm going to get you too." The defendant went home, obtained his rifle and ammunition and returned to Bowton's apartment. Upon entry there, he pointed the rifle at Bowton and ordered him to keep away from him. He then raised the rifle to his shoulder and shot the victim, who at that moment was attempting to make a telephone call. The shot entered the victim's head behind her right ear and exited in front of her left ear. She was dead when the police arrived approximately half an hour later.

## JURY ARRAY

Prior to trial, the defendant filed a motion challenging the jury array and requesting an order directing that a new jury panel be drawn on the ground that the representation of young people (which he defined as those twenty-nine years of age or younger) was not fair and reasonable in relation to the actual population of that age group in Sheboygan County. The panel from which the jury was to be drawn contained the names of 101 people. Of that total, four were twenty-nine years of age or younger.

At the hearing on this motion, the defendant examined the three jury commissioners for Sheboygan County and offered the testimony of Thomas J. Peneski, an assistant professor of mathematics, as an expert on the variation

between the percentage of young people in Sheboygan County and the number of young people on the jury array. Assuming the master jury list to be an accurate reflection of the actual age distribution in the county (25% under thirty years of age according to the 1970 Census of Population), Mr. Peneski testified to the extremely low probability of a jury array of 101 containing the names of only four people under age thirty. Mr. Peneski concluded that, in his opinion, the jury selection process in Sheboygan County did not appear to be a random selection process.

The testimony of the three jury commissioners need not be restated in detail. Their testimony noted the inherent problems encountered in attempting to reach young people for jury service and, in the case of two commissioners, revealed a conscious effort on their part to see that young people were adequately represented on the master jury list.

In its memorandum decision denying the defendant's motion, the trial court relied on a random selection of nine regular thirty-six member jury arrays drawn at various times since 1973. On those panels, forty-nine out of 324 were under thirty years of age. The court found that these figures clearly demonstrated that young people in the county were not excluded from jury service.

■ The United States Supreme Court recently set forth what a defendant must prove to show a prima facie violation of his sixth amendment right to a jury pool representing a fair-cross-section of the community in *Duren v. Missouri,* 439 U.S. 537, 58 L. Ed.2d 579, 586–87 (1979):

In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is

not fair and reasonable in relation to the number of such persons in the community; and (3) that this under-representation is due to systematic exclusion of the group in the jury-selection process.

■■■ With respect to the first element of the above test, the Wisconsin Supreme Court has recognized young people as a "cohesive unit" which, if excluded, is a sufficient ground for a sixth amendment challenge. *State v. Holmstrom*, 43 Wis.2d 465, 473, 168 N.W.2d 574, 578 (1969) ; *accord, Wilson v. State*, 59 Wis.2d 269, 281, 208 N.W.2d 134, 141 (1973). The State, however, urges that we re-examine *Holmstrom*, insofar as it recognizes young people as a distinctive group because, with the exception of *United States v. Butera*, 420 F.2d 564 (1st Cir. 1970), other federal and state courts have unanimously held that young adults are not a cognizable class whose exclusion from the jury selection process renders it constitutionally infirm. [1]

■■■ If constitutional principles were decided by a majority vote of the courts in the country, *Holmstrom* would indeed be turning slowly in the wind awaiting its last breath. Fortunately, we are not required to go beyond the members of this court for a showing of hands on the determination of constitutional questions. We are convinced that young adults do constitute a distinctive group whose systematic exclusion from jury service violates the

[1] *See e.g., United States v. Test*, 550 F.2d 577 (10th Cir. 1976) ; *United States v. Greene*, 489 F.2d 1145 (D.C. Cir. 1973) ; *United States v. Olson*, 473 F.2d 686 (8th Cir. 1973) ; *United States v. Ross*, 468 F.2d 1213 (9th Cir. 1972) ; *United States v. Kuhn*, 441 F.2d 179 (5th Cir. 1971) ; *United States v. Di Tommaso*, 405 F.2d 385 (4th Cir. 1968) ; *United States v. Guzman*, 337 F. Supp. 140 (S.D.N.Y. 1972) ; *Barrow v. State*, 239 Ga. 162, 236 S.E.2d 257 (1977) ; *People v. Redwine*, 50 Mich. App. 593, 213 N.W.2d 841 (1973).

sixth amendment fair-cross-section requirement. Although we recognize the difficulties inherent in reaching young adults for jury service, we do not believe the sixth amendment fair-cross-section requirement must step aside for the sake of convenience. The young adults of our society are a "cohesive unit" or "distinctive group" for purposes of a sixth amendment challenge to a jury array.[2]

Having found that young adults do constitute a distinctive group, we turn to the second element of the test to determine whether the representation of that group on juries is fair and reasonable in relation to the population in the county.

It cannot be seriously argued that 4% representation of a group on a jury array is fair and reasonable when that group constitutes 25% of the population. If the examination of one jury array were sufficient to establish underrepresentation of a group, we would feel compelled to rule in favor of the defendant.

However, a showing of disproportionate representation of a group on one jury array is not enough. Proof of underrepresentation is intimately tied to proof of the third element of whether such underrepresentation is the result of a systematic exclusion of the group in the jury selection process. In *Holmstrom, supra,* at 472, 168 N.W.2d at 578, the supreme court noted that a "systematic exclusion can be shown by the direct testimony of

---

[2] Although for purposes of this appeal we accept the defendant's classification of young adults as those between the ages of eighteen and twenty-nine, our acceptance should not be interpreted as requiring that only these specific age limits may be analyzed in any jury challenge based on a disproportionate jury representation of young adults. Differences in the age distribution of the adult population of the community may, in some instances, require different age limits in order to allow a meaningful analysis of the juror-population percentages.

the jury commissioners or by proving a disproportionate representation of a unit of citizens on the jury array *over a period of time."* (Emphasis added.) Thus, in order to establish the final element of prima facie violation of the fair-cross-section requirement, the challenger must show one of two things—a jury selection process that in itself tends to exclude members of the underrepresented group, or a disproportionate representation of a group on juries over a period of time.

The testimony of the jury commissioners refutes any inference that young adults were deliberately excluded from the master jury list. On the contrary, two of the commissioners testified they had made conscious efforts to obtain the names of young adults for jury service and had submitted a significant number to the master jury list. The third commissioner had served in that position for less than a year and had not submitted any names to the master list. The selection process itself, therefore, does not show a system designed to exclude young adults from jury service.

As previously noted, the number of young adults on the jury array was not fair and reasonable in relation to the adult population. The evidence offered by the defendant, however, was limited to an examination of only one array of 101 potential jurors. The trial court went beyond this evidence in determining the representation of young adults to be fair and reasonable. In doing so, the court properly followed the directive of *Holmstrom, supra,* that disproportionate representation must be established "over a period of time" absent testimony of systematic exclusion by the jury commissioners. The review of jury arrays over a period of time is also mandated by the United States Supreme Court as evidenced by the requirement of *Duren v. Missouri, supra,* that underrepresentation of a group must be shown in "venires from which juries are selected . . . ." Contrary to the

defendant's contention, it would have been error if the trial court had *not* examined previous jury panels in its determination of the defendant's challenge. Disproportionate representation of a group in one array is insufficient to establish a systematic exclusion.[3]

Unfortunately, the record does not reveal how many young adults were on the master jury list. The only evidence we have of the number of young adults on other panels is the trial court's independent review of nine thirty-six member panels drawn since 1973. Combining those panels reviewed by the trial court and the present one challenged by the defendant, it appears that persons under the age of thirty comprised 12.7% of those called for jury service. Although this is still less than the 25% reflected in the total population of the county, we believe it is a fair and reasonable representation.

The jury pool need not be a statistical mirror of the community. *United States v. Greene*, 489 F.2d 1145, 1149 (D.C. Cir. 1973). Absolute proportional representation is not required. The fair-cross-section requirement is met if *substantial* representation of a distinctive group exists. *United States v. Di Tommaso*, 405 F.2d 385, 390 (4th Cir. 1968). Although the particular panel in this case was clearly disproportionate, we cannot conclude that 12.7% young adults where the general population is 25% is not fair and reasonable. Therefore, the defend-

[3] Moreover, proof confined to a single venire is itself of dubious value because fortuity can account for any disproportion that may appear on a particular venire. Absent evidence that either more than a mere coincidental number of immediate juries, venires or panels are similarly constituted, or that qualifications or dispensations have been administered discriminatorily, proof confined to a jury plan's operation for a short duration should be received skeptically. (Footnotes omitted.) Gewin, *An Analysis of Jury Selection Decisions*, reprinted in *Foster v. Sparks*, 506 F. 2d 805, app., at 834 (5th Cir. 1975).

ant failed to establish a prima facie violation of the fair-cross-section requirement, and the trial court properly denied the motion to strike the array.

## DEFENSE PSYCHIATRIST'S REPORT

At the arraignment, the defendant entered a plea of not guilty and not guilty by reason of mental disease or defect. He thereupon retained two psychiatrists to examine him pursuant to sec. 971.16(3), Stats. In the list of witnesses submitted by the defendant, one of the psychiatrists, Dr. George Arndt, was not identified as a potential witness. However, the State listed Dr. Arndt as a potential witness for the prosecution.

The defendant thereupon filed a motion seeking an order preventing the State from calling Dr. Arndt as a witness. At the hearing on this motion, the State moved the trial court for an order directing Dr. Arndt to furnish a report concerning his examination. The trial court denied the defendant's motion and ruled that the State could subpoena Dr. Arndt as a witness and ordered Dr. Arndt to furnish a report of his examination of the defendant to the State.

Prior to trial, the defendant withdrew his plea of not guilty by reason of mental disease or defect. Although psychiatric testimony was received at trial on the issue of the defendant's capacity to form the intent to kill, Dr. Arndt was not called as a witness.

The defendant now contends the order of the trial court allowing the State to receive the report of Dr. Arndt and call him as a witness at trial if they so desired violated the attorney-client privilege and denied him the right to effective assistance of counsel.

We decline to review the contentions of the defendant on this issue for we are unable to see any way in which he was prejudiced by the order. Dr. Arndt was not

called by the State as a witness at trial. His report was not used by any of the psychiatrists who did testify and thus was not offered into evidence. Furthermore, in his report, Dr. Arndt was unable to form a conclusion on the one psychiatric issue that remained at trial—whether the defendant had the mental capacity to form the intent to kill. The report, therefore, was neither helpful nor harmful to either the defendant or the State.

Even where error is committed at trial, a conviction will not be overturned unless it appears that "the result might probably have been more favorable to the party complaining had the error not occurred." *Novitzke v. State,* 92 Wis.2d 302, 308, 284 N.W.2d 904, 907 (1979); *Hart v. State,* 75 Wis.2d 371, 394, 249 N.W.2d 810, 820 (1977). Here, the defendant is, in effect, seeking reversal because he might have been prejudiced if Dr. Arndt had been called as a State's witness. The fact that he was not called leaves us with nothing to review.

## INSTRUCTIONS

The defendant contends the trial court erred in rejecting his proposed instructions on first and second-degree murder and expert testimony. The only substantive difference between the instructions given and those requested by the defendant is that the word "specific" was inserted before the word "intent" in each of the defendant's proposed instructions.

In *State v. Lenarchik,* 74 Wis.2d 425, 455, 247 N.W.2d 80, 96 (1976), the supreme court stated the standard for review of a trial court's refusal to give requested instructions, "A trial court has wide discretion as to instructions. If the instructions of the court adequately cover the law applicable to the facts, this court will not find

error in the refusal of special instructions even though the refused instructions themselves would not be erroneous." (Citations omitted.)

Although the modified instructions requested by the defendant would not be a misstatement of the law, the instructions given by the court sufficiently delineate between first and second-degree murder. The trial court did not err in rejecting these instructions.

The defendant also alleges error in the trial court's failure to give his requested theory of defense instructions. These three proposed instructions all concerned the difference between first and second-degree murder, *i.e.*, specific intent versus conduct imminently dangerous to another evincing a depraved mind regardless of human life.

A defendant does have the right to an instruction on the theory of defense if there is one. However, the legal theory upon which the defense relies and the evidentiary facts offered in support of the same must be distinguished. *State v. Davidson*, 44 Wis.2d 177, 191, 170 N.W.2d 755, 763 (1969). A recital of the latter by the trial court must be avoided as it constitutes an impermissible comment on the evidence by the court. *Davidson, supra*, at 192, 170 N.W.2d at 763.

The defendant's "theory" in this case was simply that he lacked the requisite intent to commit first-degree murder. Therefore, his "theory" was adequately explained to the jury through the general instructions given on intent. The proposed instructions submitted by the defendant merely highlighted the evidentiary facts in support of his contention that he did not intend to kill the victim. Such "instructions" are improper, and the trial court correctly rejected them. *McAllister v. State*, 74 Wis.2d 246, 253, 246 N.W.2d 511, 515 (1976).

## SUFFICIENCY OF THE EVIDENCE

Finally, the defendant challenges the sufficiency of the evidence to support the verdict. The basis of this claim is that the testimony of Dr. Blevins, a defense psychiatrist, that the defendant was incapable of forming the intent to kill, precludes a conviction for first-degree murder.

This contention is wholly without merit. The conclusion of Dr. Blevins concerning the capacity of the defendant was disputed by Dr. Fosdal, the State's expert, who testified that the defendant had the capacity to form the intent to kill. Where conflicting expert testimony is offered on the question of a defendant's capacity or lack thereof, it is for the jury to determine weight and credibility. *Schultz v. State,* 87 Wis.2d 167, 173, 274 N.W.2d 614, 617 (1979). Here, the jury weighed the testimony of each expert and decided adversely to the defendant. That it did so does not render the evidence insufficient.

*By the Court.*—Judgment and order affirmed.