BRASH, J.
¶1 Michael Exhavier Dunn appeals from his judgment of conviction, entered upon a jury's verdict, for robbery with the use of force as a party to a crime. Dunn also appeals the order denying his motion for postconviction relief.
¶2 Dunn argues that the constitutional requirement for a jury pool to represent a fair cross section of the community was violated here, and further, that he was denied equal protection when the State used two peremptory strikes to remove two African-American jurors from the pool. Dunn also makes a claim of ineffective assistance by his trial counsel due to his failure to cross-examine a witness for the State regarding her identification of Dunn from surveillance video.
¶3 The postconviction court[1] denied Dunn's motion without a hearing. We affirm.
BACKGROUND
¶4 The charge against Dunn stems from a robbery that occurred on the evening of April 3, 2015. West Allis Police were called to a business where they made contact with the victim, V.S. V.S. was wearing only a hoodie and boxer shorts; his head was bleeding, and he also appeared to have a "zig-zag shoe print" on his forehead.
¶5 V.S. explained that he had used Backpage.com to hire a female prostitute whom he then met at a Days Inn in West Allis. After they went to a room in the hotel, two African-American males came out of the bathroom and began beating V.S. The two males took V.S.'s pants, which contained his cell phone, debit cards, and approximately $ 380. They then fled the hotel with the female; V.S. walked to the business to call the police.
¶6 The police went to the Days Inn to investigate and obtained surveillance video from the hotel from approximately 7:00 p.m. that evening. The video showed two males-later identified as Dunn and Austin Cooper-and a female-later identified as Sarah Parker-enter the hotel together. Dunn and Cooper went to the room while Parker went downstairs to meet V.S. and bring him up to the room. The video shows that a short time later Dunn, Cooper, and Parker ran from the hotel carrying some clothing-including a pair of pants-and fled in a Ford Explorer. V.S. was able to identify Parker, whom he knew as "Anna," but was unable to identify Dunn and Cooper because they had attacked him from behind and had on hooded sweatshirts.
¶7 Two witnesses at the hotel were able to provide the license plate number of the Ford Explorer. The next day, April 4, 2015, police located the Explorer in the parking lot of Southridge Mall, with Dunn, Cooper, and Parker inside. A sweatshirt worn by one of the men in the surveillance video was found in the vehicle, along with a Wisconsin identification card belonging to Dunn. V.S.'s pants were found a short distance away. Dunn, Cooper, and Parker were arrested and charged with robbery with the use of force.
¶8 Additionally, V.S. had activated the "Find my Phone" application for his cell phone. He tracked it online to a general location in the vicinity of South 65th Street and West Mitchell Street. The police were aware that Dunn's mother lived on West Mitchell Street. The police searched her residence on April 4, 2015, and discovered V.S.'s cell phone in a laundry basket.
¶9 Police also identified the owner of the Ford Explorer as Dana Ganske. She had been dating Dunn for about seven months at the time of the incident. When police spoke to her on April 4, 2015, she told them that her vehicle had been in her possession all day on April 3.
¶10 Approximately two months later, however, police arrested Ganske, telling her she could be charged with aiding a felon for lying to them and that she could go to prison, which could result in her losing custody of her child. She then admitted that she had lied to the police because Dunn had told her to, and she did not want him to get into trouble.
¶11 Ganske stated that Dunn had borrowed her vehicle on April 3 at about 3:00 p.m. and returned it at approximately 11:00 p.m. The police also showed her the surveillance video from the Days Inn. Ganske identified her vehicle in the video. Ganske also identified Dunn in the video, stating that she recognized his walk and that she had bought the clothes he was wearing. Ganske noted that she had known Dunn for about ten years, since they were in middle school.
¶12 The matter proceeded to trial, which was held over three days in February and March 2016. A jury pool of thirty prospective jurors was requested, which is standard; both Dunn and the State agreed that was acceptable. However, Dunn's trial counsel advised the trial court that at a previous jury trial "the number of African-Americans on the panel was greatly underrepresented" and that if the same situation arose for this trial, he might make a motion challenging the jury pool since Dunn is African-American. The trial court responded:
THE COURT: Well, you may but I don't know what kind of a challenge you would bring because of course it's not to the thirty people that are brought here. It's the people that are called by Milwaukee County. And quite frankly, I doubt that you've got the data to challenge that. My information is that they're very careful about calling in a cross[ ]section of the community. And that's the information that I've been provided. But we'll see if and when it is raised, we'll certainly address any objection or request you have.
¶13 The jury pool contained only three African-Americans out of the thirty prospective jurors. Dunn's trial counsel raised the objection that there was a cross section violation, citing statistics from the Wisconsin Blue Book.[2] Counsel had made calculations based on that statistical information, finding that the African-American voting population in Milwaukee County was approximately 23.6 percent. Thus, counsel argued that African-Americans in this jury pool-at only ten percent-were underrepresented. Counsel conceded that he did not have enough information regarding Milwaukee County's jury pool procedures to establish a prima facie violation of the cross section requirement, but he requested that the court use its inherent authority to ensure a fair cross section of jurors.
¶14 The trial court stated that the objection to the jury pool was premature. The court determined that they needed to wait until the jury panel was chosen. The court also noted that since V.S. was also a minority-although not African-American-this may not be the "ideal case" for making that argument.
¶15 The State subsequently struck two of the African-American jurors from the pool. Dunn's trial counsel renewed his motion, stating that the cross section had been reduced to a seven percent representation of African-Americans on the jury panel. Counsel again requested that the court use its inherent authority to strike the jury panel so that a different panel could be chosen.
¶16 In response, the State provided race-neutral reasons for striking the two African-American jurors: one was asleep, and one worked third shift, and the prosecutor stated that it was his general practice to strike third-shift workers. Therefore, the State asserted that there was no violation of the rule set forth in Batson v. Kentucky , 476 U.S. 79, 96 (1986), prohibiting "purposeful discrimination" in empaneling a jury. The trial court agreed with the State that there was no Batson violation, and further, that there was no reason to strike the jury panel based on equity grounds. It therefore denied the request.
¶17 The trial proceeded. V.S., Ganske, and the investigating officers all testified. Dunn's trial counsel cross-examined Ganske regarding her change in story between her initial statement to police about her vehicle being in her possession all day on the day of the incident, to her statement after she was arrested two months later and she admitted Dunn had borrowed the vehicle. Dunn did not testify, and the defense did not call any witnesses.
¶18 The jury returned a guilty verdict. Dunn was sentenced in May 2016 to eight years of initial confinement and four years of extended supervision.
¶19 Dunn filed a motion for postconviction relief in December 2017. He alleged ineffective assistance of his trial counsel on the ground that he had failed to cross-examine Ganske regarding her identification of Dunn and her vehicle in the surveillance video, since Dunn was wearing a hoodie and the license plate number of her vehicle was not visible. He also asserted that he was entitled to a new trial because he was denied his right to a jury drawn from a representative cross section of the community based on Milwaukee County's exclusive use of Department of Transportation (DOT) lists for jury selection.
¶20 The postconviction court denied Dunn's motion without a hearing. Regarding the ineffective assistance claim, the court held that Dunn had not demonstrated prejudice because based on the other evidence against him, there was "absolutely no probability of a different outcome" and therefore his claim failed.
¶21 With regard to Dunn's jury pool argument, the postconviction court noted that his objection at trial was regarding the specific jury panel chosen, whereas his postconviction argument focused on a more general objection to Milwaukee County's jury-selection process. The court held that it did not have jurisdiction over that process. It therefore denied Dunn's motion in its entirety. This appeal follows.
DISCUSSION
Fair Cross Section Requirement
¶22 We first address Dunn's argument that the fair cross section requirement for jury pools was violated due to Milwaukee County's exclusive use of DOT lists for its jury-selection process. A criminal defendant has a right, under the Sixth and Fourteenth Amendments, to a jury that has been "selected from a fair cross section of the community." Duren v. Missouri , 439 U.S. 357, 359 (1979). We independently review challenges to constitutional principles. State v. Pinno , 2014 WI 74, ¶36, 356 Wis. 2d 106, 850 N.W.2d 207.
¶23 To establish a prima facie violation of the fair cross section requirement, a defendant must demonstrate:
(1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.
Duren , 439 U.S. at 364.
¶24 The State concedes, and we agree, that African-Americans are a distinctive group under the Duren test. Therefore, the first prong is satisfied.
¶25 With regard to the second prong, a fair cross section is present if "[s]ubstantial representation of a distinctive group exists." State v. Pruitt , 95 Wis. 2d 69, 78, 289 N.W.2d 343 (Ct. App. 1980). However, a jury pool "need not be a statistical mirror of the community," and "[a]bsolute proportional representation is not required." Id. There is no "de minimus disparity [that] amounts to an unfair or unreasonable representation of any 'distinctive group.' " United States v. McAnderson , 914 F.2d 934, 941 (7th Cir. 1990). In fact, "discrepancies of less than ten percent, standing alone, cannot support a claim of underrepresentation." Id.
¶26 Furthermore, with regard to the third prong of the test, a disproportionate representation of a distinctive group on one jury panel is not sufficient to prove systematic exclusion of that group. Pruitt , 95 Wis. 2d at 76. Thus, to prove the third prong, a defendant must show either "a jury[-]selection process that in itself tends to exclude members of the underrepresented group, or a disproportionate representation of a group on juries over a period of time." Id. at 77.
¶27 In support of his claim, Dunn calculated disparity rates for African-American jurors, along with Hispanic jurors, from statistics garnered from Milwaukee County's Basic Jury System Evaluation Report for 2015. The "absolute disparity" rate is calculated by taking the percentage of a particular minority in the jury pool and subtracting it from the percentage that minority group represents in the jury-eligible population. Berghuis v. Smith , 559 U.S. 314, 323 (2010).[3]
¶28 Dunn's calculations show the disparity rate for both of these distinctive groups to be less than ten percent.[4] As set forth in McAnderson , those discrepancies alone do not support Dunn's claim. See id. , 914 F.2d at 941.
¶29 Nevertheless, Dunn contends that Milwaukee County uses only a DOT list for its jury-selection process, and that consequently a significant number of Milwaukee County residents are excluded from juries since they do not have a driver's license or identification card. He asserts that those excluded from the DOT list are disproportionately minorities, citing a study performed by the University of Wisconsin-Milwaukee. Therefore, he argues that using the DOT list results in a systematic exclusion of minorities in the Milwaukee County jury pool, which translates into an underrepresentation of minorities on juries.
¶30 There are several problems with Dunn's analysis. First, in Wisconsin, a master list of potential jurors is compiled each year by the Office of the Director of State Courts for use by the circuit courts in each county. WIS. STAT. § 756.04(2)(a) (2017-18).[5] The list is drawn from information provided by the DOT; however, the Director of State Courts may also use lists from other government entities, such as the Department of Revenue, the Department of Natural Resources, and the custodian of registered voter lists to compile its master list. Sec. 756.04(2)(b)-(c). The circuit courts must use the master list provided by the Director of State Courts for its jury-selection process. Sec. 756.04(2).
¶31 Dunn's argument that Milwaukee County exclusively uses a list provided by the DOT is based on a notation on the Milwaukee County website. He does not address the statutory requirements or provide any information from the Office of the Director of State Courts relating to its preparation of the master list that Milwaukee County is required to utilize. His argument is incomplete without that information.
¶32 Furthermore, Dunn has not shown that there is an underrepresentation of minorities on Milwaukee County juries: his own calculations show absolute disparities of less than ten percent, which is within the acceptable threshold. See McAnderson , 914 F.2d at 941. Thus, the analysis of the Duren test need not reach the prong that asks whether a systematic exclusion caused underrepresentation of minorities, since there is no proven underrepresentation. See id. , 439 U.S. at 364.
¶33 Moreover, Dunn's analysis of that third prong of the Duren test is not compelling. He refers to an audit of the Milwaukee County jury-selection process performed in 2007, which noted disparities in the number of minorities in jury pools. He points out that explanations for the disparities included in the report note the use of the DOT list, as well as problems with individuals failing to respond and report for jury duty, and the rate at which potential jurors were legally disqualified and excused.
¶34 We do not find an audit that is more than ten years old to be particularly persuasive.[6] Additionally, Dunn does not discuss the other relevant factors listed in the audit; he merely focuses on the continued use of the DOT list which, as we have explained, is statutorily mandated.
¶35 For these reasons, we conclude that Dunn has not made a prima facie case that his right to a jury consisting of a fair cross section of the community was violated. See id.
Batson Violation
¶36 We next turn to Dunn's claim that the State's use of peremptory strikes for two African-Americans in the jury pool was a Batson violation. In Batson , the United States Supreme Court held that the intentional exclusion of African-Americans from a jury on the basis of race is a violation of the Equal Protection Clause. Id. , 476 U.S. at 84. This rule also applies to peremptory challenges. State v. Lopez , 173 Wis. 2d 724, 728, 496 N.W.2d 617 (Ct. App. 1992). "[W]hether a prosecutor used a peremptory challenge 'in a purposefully discriminatory manner' [is] subject to the clearly erroneous standard of review on appeal." Id. at 729 (citation and one set of quotation marks omitted).
¶37 To demonstrate a Batson violation, the defendant must first establish a prima facie case of discriminatory intent on the part of the State. State v. Lamon , 2003 WI 78, ¶28, 262 Wis. 2d 747, 664 N.W.2d 607. This is accomplished if the defendant (1) shows that he or she "is a member of a cognizable group and that the prosecutor has exercised peremptory strikes to remove members of the defendant's race from the venire," and (2) shows that the "facts and relevant circumstances raise an inference that the prosecutor used peremptory strikes to exclude venirepersons on account of their race." Id. The trial court is to consider "all relevant circumstances" in determining whether a defendant has made this showing. Id.
¶38 If the trial court determines that the defendant has made this prima facie case, the burden then shifts to the State to provide " 'a neutral explanation for challenging [the dismissed venireperson].' " Id. , ¶29 (citation omitted; brackets in Lamon ). "[A] 'neutral explanation' means an explanation based on something other than the race of the juror." Id. , ¶30 (citation omitted). "Unless discriminatory intent is inherent in the prosecutor's explanation, 'the reason offered will be deemed race neutral.' " Id. (citation omitted). Furthermore, "[u]nless the prosecutor exercised a peremptory strike with the intent of causing disparate impact, that impact itself does not violate the principle of race neutrality." Id.
¶39 The trial court then weighs the credibility of the prosecutor's race-neutral explanation. Id. , ¶32. The defendant may challenge the reasons being proffered by the State as "pretexts for racial discrimination." Id. For example, "implausible or fantastic justifications may ... be found to be pretexts for purposeful discrimination." Id. (citation omitted). However, the prosecutor's explanation "need not rise to the level of justifying exercise of a strike for cause." Id. , ¶29.
¶40 Dunn's trial counsel seems to conflate his objection to the State's use of peremptory strikes on two of the three African-Americans in the jury pool with his fair cross section challenge.[7] The State argues that Dunn has therefore forfeited a Batson argument on appeal. However, at the time of trial counsel's objection, the State responded with a reference to the Batson standard, and the trial court also referred to Batson in making its ruling on the objection. We therefore address this issue as raised by Dunn.
¶41 Although there was no discussion of the factors required for establishing a prima facie case of discriminatory intent regarding the peremptory strikes, the State responded to trial counsel's objection with race-neutral explanations for striking the two African-Americans from the jury pool: one juror was struck because she was asleep, and the other was struck because she worked third shift, and it was that prosecutor's general practice to strike jurors who work third shift. The State then pointed out that Batson requires a showing of discriminatory intent, arguing that it was not present in this case.
¶42 In response, Dunn's trial counsel stated that he had not seen the sleeping juror. Furthermore, he suggested that the third-shift worker could obtain the necessary paperwork for taking the day off from work. Indeed, the trial court had indicated during voir dire that the court preferred that jurors who work third shift take off of work during a trial because the court "want[s] you to be wide awake."
¶43 Trial counsel also pointed out that another juror had also indicated that he worked third shift but was not struck. He was referring to a juror who stated that he provided winter services, and thus if it snowed during the night he was required to work.
¶44 After hearing from both parties, the trial court determined that there was no Batson violation and proceeded to trial with that jury panel.
¶45 "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." Hernandez v. New York , 500 U.S. 352, 359 (1991). Although the trial court made no specific credibility findings, it accepted the State's race-neutral explanations in holding that there was no Batson violation.
¶46 We agree with the trial court's ruling. There is no indication in the record suggesting that there was any discriminatory intent on the part of the State. The State provided explanations for its peremptory strikes that did not contain any inherent discriminatory intent, nor were those explanations " 'implausible or fantastic.' " See Lamon , 262 Wis. 2d 747, ¶¶30, 32 (citation omitted). Furthermore, any resulting race disparity in the jury panel does not violate the principle of race neutrality since there is no evidence that the State intended to cause any "disparate impact." See id. , ¶30. Therefore, we conclude that the trial court's determination was not clearly erroneous. See Lopez , 173 Wis. 2d at 729.
Ineffective Assistance of Counsel
¶47 Finally, Dunn claims that his trial counsel was ineffective in his cross-examination of Ganske. Specifically, he argues that counsel's cross-examination focused on Ganske's credibility with regard to the different statements she gave to the police, when he should have also questioned her identification of Dunn and the Ford Explorer on the surveillance video from the Days Inn. He asserts that he is entitled to an evidentiary hearing on this issue.
¶48 In a claim of ineffective assistance of counsel, the defendant must demonstrate: "(1) that his counsel's performance was deficient; and (2) that the deficient performance was prejudicial." State v. Romero-Georgana , 2014 WI 83, ¶39, 360 Wis. 2d 522, 849 N.W.2d 668. "To prove constitutional deficiency, the defendant must establish that counsel's conduct falls below an objective standard of reasonableness." State v. Love , 2005 WI 116, ¶30, 284 Wis. 2d 111, 700 N.W.2d 62. "To prove constitutional prejudice, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. (citation and internal quotation marks omitted). "A court need not address both components of this inquiry if the defendant does not make a sufficient showing on one." State v. Smith , 2003 WI App 234, ¶15, 268 Wis. 2d 138, 671 N.W.2d 854. "The ultimate determination of whether counsel's performance was deficient and prejudicial to the defense are questions of law which this court reviews independently." State v. Johnson , 153 Wis. 2d 121, 128, 449 N.W.2d 845 (1990).
¶49 The trial court may, in its discretion, deny a postconviction motion without an evidentiary hearing "if the motion fails to allege sufficient facts to raise a question of fact, presents only conclusory allegations, or if the record conclusively demonstrates that the defendant is not entitled to relief." State v. Roberson , 2006 WI 80, ¶43, 292 Wis. 2d 280, 717 N.W.2d 111 (citation and emphasis omitted). Dunn's allegation-that his trial counsel's failure to attack Ganske's credibility regarding her identification of Dunn and her vehicle in the surveillance video "overinflate[ed]" her testimony-is conclusory.
¶50 Ganske testified that she had known Dunn for about ten years and had been dating him for several months prior to the incident. She stated that she recognized him in the video from the way he walked, and also noted that she had bought him the clothes he was wearing. It is unlikely that further questioning by trial counsel would have led to Ganske changing her mind regarding her identification; instead, such a line of questioning likely would have only served to underscore the facts upon which she based her identification. "It is well[ ]established that trial counsel could not have been ineffective for failing to make meritless arguments." State v. Allen , 2017 WI 7, ¶46, 373 Wis. 2d 98, 890 N.W.2d 245.
¶51 Furthermore, Dunn has not demonstrated that he was prejudiced by this alleged failure of trial counsel in light of the other evidence against him. That evidence included: the police finding Dunn in Ganske's vehicle the day after the incident; police also finding in the vehicle a sweatshirt worn by one of the suspects at the time of the robbery, as seen in the surveillance video; and the police finding V.S.'s cell phone at Dunn's mother's residence. Put another way, Dunn does not explain how an attempt by trial counsel to undermine Ganske's identification of him would have provided a reasonable probability that the outcome of the trial would have been different given the other evidence against him presented to the jury. See Love , 284 Wis. 2d 111, ¶30. Because Dunn has not provided facts that would call into question the outcome of the trial, he was not entitled to an evidentiary hearing. See Roberson , 292 Wis. 2d 280, ¶43. His claim fails.
¶52 Accordingly, we affirm Dunn's judgment of conviction and the order of the postconviction court denying his motion.
By the Court. -Judgment and order affirmed.
Not recommended for publication in the official reports.

Dunn's trial was before the Honorable William S. Pocan, who we will refer to as the trial court. The postconviction motion was heard by the Honorable David A. Hansher due to judicial rotation; we will refer to him as the postconviction court.

The Wisconsin Blue Book is a biennial publication of the Wisconsin Legislative Reference Bureau which contains information about the State of Wisconsin, including population statistics.

Dunn also calculated "comparative disparity," which calculates the likelihood of the minority group to be on the jury-selection list by dividing the absolute disparity for that group by the group's representation in the jury-eligible population. See Berghuis v. Smith , 559 U.S. 314, 323 (2010). However, Dunn does not apply those calculations to the context of his argument, or explain how they affect the analysis of the Duren test. See Duren v. Missouri , 439 U.S. 357, 364 (1979). We decline to develop this argument for him. See Industrial Risk Insurers v. American Eng'g Testing, Inc. , 2009 WI App 62, ¶25, 318 Wis. 2d 148, 769 N.W.2d 82.

The State contends that Dunn's calculations are erroneous, and provides different calculations; those calculations also show a disparity of less than ten percent.

All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

Dunn states that he was not able to find a more recent audit.

After the jury panel was chosen, Dunn's trial counsel renewed his objection to the number of African-Americans on the panel, again arguing that it was not a fair cross section of the community. He did not make an argument utilizing the Batson analysis; in fact, he stated that he "[did] not have grounds at this point to raise a Batson challenge because I haven't been able to see how ... Milwaukee County picks its [prospective] jurors." Dunn's postconviction counsel stated that it appears that trial counsel inaccurately described his fair cross section challenge as a Batson challenge; we agree that seems to be the case.