STATE of Wisconsin, Plaintiff-Respondent,

v.

Nancy R. LAMON, Defendant-Appellant-Petitioner.

Supreme Court

*No. 00–3403–CR. Oral argument February 19, 2003.—Decided July 2, 2003.*

2003 WI 78

(Also reported in 664 N.W.2d 607.)

For the defendant-appellant-petitioner there were briefs by *Timothy A. Provis,* Madison, and oral argument by *Timothy A. Provis.*

For the plaintiff-respondent the cause was argued by *Mary E. Burke,* assistant attorney general, with whom on the brief was *James E. Doyle,* attorney general.

¶ 1. N. PATRICK CROOKS, J. Nancy R. Lamon (Lamon) seeks review of a court of appeals' decision that

affirmed the circuit court's finding that the State's peremptory strike of a potential juror was not in violation of the test established under *Batson v. Kentucky*, 476 U.S. 79, 96–98 (1986).

¶ 2. We affirm the decision of the court of appeals. We give deference to the circuit court's decision based on the standard set forth in *Hernandez,* and hold that clearly erroneous is the correct standard of review in this case. *Hernandez v. New York,* 500 U.S. 352, 364 (1991). We hold that the decision of the circuit court was not clearly erroneous under *Batson,* because the State offered sufficient evidence for its race-neutral justification.

## I. BACKGROUND

¶ 3. The facts are undisputed. Leeman Jones (Jones), an African-American, was driving home around 1:00 or 1:30 a.m. on May 31, 1998, when Nancy R. Lamon (Lamon) flagged him down. She expressed the need to be taken to a telephone and got into Jones' car. Jones began driving, but stopped the car upon Lamon's statement that her friend was in a car behind them. Jones stopped the car and the person in that car approached Jones' window and asked for Jones' wallet while Lamon threatened Jones with an object on his right side. Jones complied and his money was taken from his wallet. Lamon exited Jones' car and entered her friend's car.

¶ 4. On June 3, 1998, a complaint was filed in Rock County Circuit Court charging Lamon with violating Wis. Stat. § 943.32(1)(b) & (2)[1] (armed robbery by threat of force with article reasonably believed to be

---

[1] All references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise noted.

a dangerous weapon). The complaint also alleged Lamon was a repeater as defined in Wis. Stat. § 939.62(1)(c).

¶ 5. On June 30, 1998, Lamon entered a plea of not guilty. Lamon then entered a motion to dismiss, claiming lack of probable cause at the preliminary hearing. The circuit court denied the motion finding that there was sufficient evidence for Jones to have had a reasonable belief that he was threatened by a weapon.

¶ 6. On April 14, 1999, jury selection for Lamon's trial began. Twenty out of 35 possible jurors were called and seated in the jury box; one of which was Mr. Dondre Bell (Bell). Bell was the only African-American in the jury pool. The circuit court questioned the venire first. Bell did not respond affirmatively to any of these questions, although others did answer yes and were asked follow-up questions.

¶ 7. The court asked the potential jurors the following questions:

Is anyone related by blood or marriage to Lamon? (R. 60:7).

Is anyone otherwise acquainted with Lamon? (R. 60:7).

Is anyone related by blood or marriage, or otherwise acquainted with defense counsel or the Assistant District Attorney? (R. 60:8–9).

Does anyone have any possible financial interest, or other possible interest in the outcome of the trial? (R. 60:10).

Does anyone have some feeling of bias or prejudice for or against the State or the defendant, keeping in mind the charge of armed robbery? (R. 60:10).

Does anyone have a compelling reason why they should not be compelled to serve for possibly two days? (R. 60:10).

Does anyone believe that they could not be fair and impartial? (R. 60:10–11).

¶ 8. Assistant District Attorney Jodi Dabson Bollendorf (Bollendorf) then conducted a general voir dire of the venire. Bell did not respond affirmatively to any of these questions, but other potential jurors answered yes to some of the questions. Specifically, Bollendorf asked:

> Is there any of you who has had contact with the Rock County District Attorney's Office in any capacity? As a victim, as a witness, as a defendant? Just to call up and ask a question or any capacity whatsoever? . . . No one's had contact. (R. 60:11).

> Is there any of you who has ever been a victim of a crime? (R. 60:11).

> Is there anyone here who has a close friend or relative who has been the victim of a crime? (R. 60:15).

> Are there other people besides those that have already raised their hands that are in that situation who have a close friend or relative who has been convicted? (R. 60:18).

¶ 9. Bollendorf then asked if anyone was acquainted with or knew of people involved in the incident.[2] Moreover, Bollendorf asked if anyone would have difficulty determining guilt or innocence based on the reasonable doubt standard, or whether they believed the standard should be different. Finally, Bollendorf asked whether there was any reason why a juror may not be able to sit in judgment of another.

---

[2] Bollendorf listed Leeman Jones, Officer Dan Daly, Officer Tom Niman, Officer Bobby Pittman, Lamon's family including Maggie Lamon and Bobbie Lamon a/k/a Bobbie Goode.

¶ 10. Defense counsel, Jeffery Livingston (Livingston), then conducted his voir dire. None of the prospective jurors responded to the following questions:

Whether anyone had dealings with his law office under its current or past name. (R. 60:21).

Had anyone been prosecuted for a traffic crime? (R. 60:21).

Did anyone feel they could not hold the state to the high burden of beyond a reasonable doubt? (R. 60:21).

Did anyone believe that a police officer made for a more believable witness? (R. 60:22).

Did anyone believe that Lamon must have done something wrong to be in this position? (R. 60:22).

Did anyone feel they would have a hard time judging the State's case without hearing Lamon testify, and would anyone hold it against the defense if the defense argued the State did not meet its burden and then the defense did not put on its own case? (R. 60:23).

¶ 11. The attorneys then exercised their peremptory strikes. Out of the presence of the jury Livingston challenged Bollendorf's peremptory strike of Bell. Livingston made a *Batson* challenge, asking for a race-neutral explanation of the strike, on grounds that the defendant was African-American, and the prosecutor struck the only African-American on the panel. Livingston also pointed out that the victim appeared to be approximately the same age and the same race as the juror who was struck.

¶ 12. The circuit court noted that Bell was the only African-American juror and noted that Bollendorf did not ask individual questions. The circuit court then asked Bollendorf for a reason for her peremptory strike.

¶ 13. Bollendorf responded giving several reasons for her strike. First, Bollendorf said that her office and the federal prosecutor have prosecuted a number of Bells who live in Beloit through the years, and it is a well-known criminal name in Beloit. Next, Bollendorf pointed out that Bell's address is in a high crime area in Beloit and that the State obtained police reports evidencing police contacts at that address. These contacts, according to Bollendorf, ranged from civil processes to stolen vehicles. Bollendorf argued that Bell in the venire may be related to the people at that address, and that there was a number of police contacts at Bell's address, yet Bell did not answer the State's question regarding contact with their office or with law enforcement officers. Bollendorf also argued that Bell's juror card listed his employment as "varies."

¶ 14. In response to the prosecutor's answers, Livingston said that Bell is a fairly common name; Bell did not respond to the question about family members dealing with the district attorney's office; and Bollendorf did not question Bell individually as to whether he was related to the Bell family involved in criminal activity. Livingston also stated that the police contacts at Bell's address were mostly civil in nature, and that Bollendorf did not inquire individually into Bell's residence at that address. Livingston argued that Bollendorf could have asked Bell questions about these circumstances individually, and asked the court to individually voir dire Bell.

¶ 15. Bollendorf argued that Exhibit 1, the exhibit listing police contacts at Bell's address, clearly shows contacts with people named Bell. Bollendorf reiterated her concern that Bell was not completely forthright and honest as a prospective juror, because he did not answer the questions about whether a relative

had been convicted or the victim of a crime. This question was important because there was an incident at Bell's address where a "Mrs. Bell" reported her husband stole the car for purposes of supporting a drug habit. Bollendorf asserted that a lack of response from Bell the first time indicated he may not respond forthrightly with further voir dire, and the State didn't want to appear to single him out.

¶ 16. The circuit court found that Bollendorf had just cause for the peremptory strike, but did not elaborate on its decision. As a result Bollendorf's peremptory strike was allowed to stand.

¶ 17. At trial, the jury found Lamon guilty of armed robbery on April 15, 1999. On May 24, 1999, Lamon pled guilty to the charge of repeat offender and was sentenced to an indeterminate prison term not to exceed 20 years.

¶ 18. Lamon filed a post-conviction motion for a new trial on the grounds that the State's reasons offered for the peremptory challenge were not sufficient justifications. The circuit court, Honorable Daniel T. Dillon presiding, denied the motion on November 20, 2000, finding, *inter alia,* that it was reasonable for Bollendorf to conclude Bell was being less than candid in not mentioning these police contacts in which the victim presumably resided at the Bell residence.

¶ 19. The circuit court also determined that it was not necessary for the State to question Bell in front of the other jurors in order to prove the reason for the strike.

¶ 20. Lamon appealed and on April 4, 2002, the court of appeals held that Lamon failed to prove that the State did not have a race-neutral reason to strike Bell. The court of appeals held that the circuit court's ruling was not clearly erroneous to accept the

prosecutor's explanation that she did not ask Bell individual questions because she thought some of Bell's responses were not completely forthright and honest, and that she did not want to single Bell out.

¶ 21. Lamon petitioned this court for review. We granted review on September 26, 2002.

## II. PEREMPTORY STRIKES, THE BATSON TEST AND ITS PROGENY

¶ 22. Wisconsin has adopted the *Batson* principles and analysis. *See State v. Davidson,* 166 Wis. 2d 35, 39–40, 479 N.W.2d 181 (Ct. App. 1991); *State v. Gregory,* 2001 WI App 107, 244 Wis. 2d 65, 630 N.W.2d 711. For that reason, it is necessary that we begin our analysis with a summary of peremptory challenges and the *Batson* analysis.

¶ 23. Originating in English common law, the peremptory challenge is part of the fabric of our jury system and allows parties to strike a potential juror without a reason stated, without inquiry, and without being subject to the court's control.[3] The purpose of the peremptory strike is to eliminate extremes of partiality on both sides and help ensure that jurors will decide the case on the basis of the evidence presented. *Swain v. State of Ala.,* 380 U.S. 202, 219 (1965). As a result, even though the peremptory strike is not constitutionally required, the United States Supreme Court said over a century ago that the peremptory challenge is "essential to the fairness of trial by jury." *Batson,* 476 U.S. at 107 (Marshall, J. concurring) (citing *Lewis v. United States,* 146 U.S. 370, 376 (1892)).

[3] See *Batson v. Kentucky,* 476 U.S. 79, 103–05 (1986) (Marshall, J. concurring) for a detailed history of peremptory strikes.

¶ 24. A defendant's challenge to the State's use of peremptory strikes to deliberately remove jurors from the venire because of race was initially addressed by the U.S. Supreme Court in *Swain,* 380 U.S. 202. In that case the Court held that in order for a defendant to make a prima facie showing that the State had used peremptory strikes in contravention of equal protection principles, the defendant was required to show that a prosecutor had a pattern of using such strikes in a racially discriminatory manner "in case after case". *Id.* at 223. The high standard was set based on a belief that any limitation would radically alter the traditional unfettered nature of peremptory strikes. *Id.* at 221–22. *See also, Batson,* 476 U.S. at 98.

¶ 25. In 1986 the U.S. Supreme Court affirmed the prosecutor's general right to exercise peremptory strikes for any reason related to the prosecutor's view of the case outcome. *Batson,* 476 U.S. at 89. However, the Supreme Court held that: "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." *Id.* In *Batson,* the Court rejected *Swain's* "crippling" evidentiary burden for making a prima facie case of equal protection violation, and held that a defendant could establish a prima facie case by relying solely on the facts of his or her case. *Id.* at 91–92, 96.

¶ 26. In reaching its decision, the *Batson* Court held that the "invidious quality" of government action alleged to be racially discriminatory in violation of the Equal Protection Clause "must ultimately be traced to a

761

racially discriminatory purpose." *Id.* at 93 (quoting *Washington v. Davis,* 426 U.S. 229, 240 (1976)).[4]

¶ 27. As a result, the *Batson* Court outlined a three-step process for determining if a prosecutor's peremptory strikes violated the Equal Protection Clause. *Id.* at 96–98.

¶ 28. First, in order to establish a prima facie case of discriminatory intent, a defendant must show that: (1) he or she is a member of a cognizable group and that the prosecutor has exercised peremptory strikes to remove members of the defendant's race from the venire,[5] and (2) the facts and relevant circumstances raise an inference that the prosecutor used peremptory strikes to exclude venirepersons on account of their race. *Id.* at 96. The circuit court must consider all relevant circumstances in determining whether a defendant made the requisite showing. Those circumstances include any pattern of strikes against jurors of the defendant's race and the prosecutor's voir dire questions and statements. The *Batson* Court expressed "confidence that trial judges, experienced in supervising voir dire, will be able to decide if the circumstances

---

[4] " 'Discriminatory purpose' . . . implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected . . . a particular course of action at least in part 'because of' not merely 'in spite of,' its adverse effects upon an identifiable group." *Hernandez v. New York,* 500 U.S. 352, 360 (1991) (citing *Personnel Adm' of Mass. v. Feeney,* 442 U.S. 256, 279 (1979)).

[5] A defendant of whatever race is entitled to a jury selected without discrimination. *See Powers v. Ohio,* 499 U.S. 400 (1991). *See also State v. Lopez,* 173 Wis. 2d 724, 728, 496 N.W.2d 617 (1992).

concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors." *Id.* at 97.

¶ 29. Under the second step of *Batson,* if the circuit court finds that the defendant has established a prima facie case, "the burden shifts to the State to come forward with a neutral explanation for challenging [the dismissed venireperson]." *Id.* The prosecutor's explanation must be clear, reasonably specific, and related to the case at hand. *Id.* at 98 n.20. However, the prosecutor's explanation need not rise to the level of justifying exercise of a strike for cause. *Id.* at 97–98.

¶ 30. At the second *Batson* step, a "neutral explanation" means an explanation based on something other than the race of the juror. *Id.* at 98. Facial validity of the prosecutor's explanation is the issue. Unless discriminatory intent is inherent in the prosecutor's explanation, "the reason offered will be deemed race neutral." *Hernandez,* 500 U.S. at 360. Unless the prosecutor exercised a peremptory strike with the intent of causing disparate impact, that impact itself does not violate the principle of race neutrality. *Id.* at 362.

¶ 31. A prosecutor's reasons for his or her peremptory challenge need not rise to the level of a for cause challenge. According to *Purkett,* the explanation proffered at the second step need not be "persuasive, or even plausible." *Purkett v. Elem,* 514 U.S. 765, 768 (1995). *Purkett* clarified *Batson's* requirement for a clear and reasonably specific explanation of legitimate reasons, related to the particular case, for exercising a challenged peremptory strike. The *Purkett* court said:

This warning was meant to refute the notion that a prosecutor could satisfy his burden of production by merely denying that he had a discriminatory motive or by merely affirming his good faith. What it means by a 'legitimate reason' is not a reason that makes sense, but a reason that does not deny equal protection.

*Id.* at 769. Moreover, as noted previously, the Court in *Purkett* said that even a "silly or superstitious" reason, if facially nondiscriminatory, satisfies the second step of *Batson. Id.* at 768.

¶ 32. Finally, the third step of *Batson* requires that when the prosecutor offers a race-neutral explanation, the circuit court has the duty to weigh the credibility of the testimony and determine whether purposeful discrimination has been established. *Batson,* 476 U.S. at 98. As part of this third step, a defendant may show that the reasons proffered by the State are pretexts for racial discrimination. *State v. Walker,* 154 Wis. 2d 158, 176 n.11, 453 N.W.2d 127 (1990). The defendant then has the ultimate burden of persuading the court that the prosecutor purposefully discriminated or that the prosecutor's explanations were a pretext for intentional discrimination. *Batson,* 476 U.S. at 94 n.18, 98. Therefore, it is at this step that the issue of persuasiveness and plausibility of the prosecutor's reasons for the strike become relevant, and "implausible or fantastic justifications may [] be found to be pretexts for purposeful discrimination." *Purkett,* 514 U.S. at 768.

¶ 33. In addition to accepting "silly", "superstitious" justifications for striking a juror, intuitive strikes have been upheld as valid strikes. *United States v. Terrazas-Carrasco,* 861 F.2d 93, 94–95 (5th Cir. 1988). *See also United States v. Williams,* 934 F.2d 847, 850

(7th Cir. 1991) (holding that adequate explanations for exercising a peremptory strike may include a prosecutor's "intuitive assumptions that are not fairly quantifiable.").

¶ 34. Applying *Batson* and its progeny, the rule today is that the Equal Protection Clause is not violated simply because there is a racially discriminatory or a disparate impact. Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause. As noted previously, the Court in *Hernandez* said: "Discriminatory purpose [] implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker [] selected [] a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." *Hernandez,* 500 U.S. at 360 (internal citations and quotations omitted).

¶·35. Despite the protections outlined in the three-part test of *Batson,* Lamon contends that discrimination in jury selections "remains widespread." (Pet'r Br. at 7). We recognized 13 years ago that racial discrimination in the jury selection process harms three distinct groups. *Walker,* 154 Wis. 2d 158 at 171. First, defendants are harmed when racial discrimination infects the jury selection process. *Id.* Second, the rights of the excluded jurors are violated when they are denied the opportunity to serve as jurors on account of race. *Id.* (citing *Batson* at 86–87). Third, society is harmed because such discriminatory procedures undermine public confidence in the fairness of our system of justice. *Id.* That being said, we believe that the three-part *Batson* test acknowledges those potential dangers, and guards against the deprivation of equal protection. *Batson,* 476 U.S. at 86.

## III. ISSUES

¶ 36. This court is presented with two issues. First, we must answer whether the circuit court's application of the *Batson* test was incomplete, so that our review should be de novo. *Batson,* 476 U.S. at 96–98.

¶ 37. Based on the U.S. Supreme Court's decision in *Hernandez,* we hold that the appropriate standard of review is clearly erroneous.[6] Given the similar facts of this case, the determination of the credibility of prospective jurors and attorneys by the circuit court will be given great deference, and will not be overturned unless it was clearly erroneous. Here, the circuit court judge was present during the voir dire, and thus, had sufficient opportunity to observe the prospective juror and to ascertain the credibility of Bollendorf's reasons for her peremptory strike of Bell.

¶ 38. Second, we must determine whether it was clearly erroneous for the circuit court judge to permit the prosecution's peremptory challenge of Bell to stand. We hold that under the totality of the circumstances in this case, individual questions did not have to be asked of the stricken juror, Bell. Bollendorf proffered several race-neutral reasons for the strike, reinforced with evidence demonstrating a lack of discriminatory intent. The primary credibility determination relates to the proponent of the strike, and the circuit court judge is in the best position to make an appropriate determination. The record in this case supports the circuit court's decision to allow Bollendorf's peremptory strike to

---

[6] We recognize that *Hernandez* addresses federalism issues about review of state court and federal court decisions. While we are not presented with any federalism issues, we nevertheless cite the *Hernandez* case for the proposition that the appropriate standard of review is clearly erroneous.

stand. As a result, we hold that the circuit court decision was not clearly erroneous in accepting Bollendorf's reasons for striking Bell in this case.

## IV. STANDARD OF REVIEW

¶ 39. We must first determine the appropriate standard of review.

¶ 40. Lamon argues that, although the general rule set forth in *Batson* and *Hernandez* is to apply a clearly erroneous standard, the facts of this case warrant de novo review. Based on *Holder v. Welborn,* 60 F.3d 383, 388 (7th Cir. 1995), de novo review is appropriate because the circuit court did not have the opportunity to assess the credibility of the stricken juror. Lamon maintains that the lack of voir dire of Bell in this case prevented the circuit court judge, Judge Edwin C. Dahlberg, from determining Bell's credibility, which is essential in making a proper step three *Batson* evaluation. Accordingly, Lamon argues that a basis for deference does not exist in this case, and therefore, this court should apply a de novo standard of review.

¶ 41. As noted previously, we affirm the court of appeals' application of the clearly erroneous standard of review as established in *Batson* and *Hernandez. Batson,* 476 U.S. at 98 n.21; *Hernandez,* 500 U.S. at 364. The Court in *Batson* held that discriminatory intent is a question of fact decided by the circuit judge. *Batson,* 476 U.S. at 98 n.21. Moreover, the U.S. Supreme Court held that, like any other factual finding, a trial court's conclusion on the issue of discriminatory use of peremptory challenges at step three should be given great deference. *Id. See also Hernandez,* 500 U.S. at 364.

¶ 42. In reaching that decision the *Batson* Court held that the trial court judge is in the best position to determine the credibility of the state's race-neutral

767

explanations, so great deference will be given to that ruling. *Batson,* 476 U.S. at 98 n.21 (quoting *Anderson v. Bessemer City,* 470 U.S. 564, 573 (1985)).

¶ 43. The general rule in *Batson* remains good law, and was reiterated and emphasized in *Hernandez,* 500 U.S. at 365. *Hernandez* held that the circuit court's finding on the issue of discriminatory intent should not be overturned unless it is found that the determination was clearly erroneous. *Id.* at 369. The *Hernandez* Court explained:

> Deference to trial court findings on the issue of discriminatory intent makes particular sense in this context because, as we noted in *Batson,* the finding "largely will turn on evaluation of credibility." In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies "peculiarly within a trial judge's province."

*Id.* at 365 (citations omitted).

¶ 44. As a result of the U.S. Supreme Court's holding that the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact, the *Hernandez* court expressly rejected the notion of independent appellate review and said:

> We have difficulty understanding the nature of the review petitioner would have us conduct. Petitioner explains that "[i]ndependent review requires the appellate court to accept the findings of historical fact and credibility of the lower court unless they are clearly erroneous. Then, based on these facts, the appellate

768

court independently determines whether there has been discrimination." But if an appellate court accepts a trial court's finding that a prosecutor's race-neutral explanation for his peremptory challenges should be believed, we fail to see how the appellate court nevertheless could find discrimination. The credibility of the prosecutor's explanation goes to the heart of the equal protection analysis, and once that has been settled, there seems nothing left to review.

*Id.* at 366–67 (citations omitted).[7]

¶ 45. Wisconsin law is in accord with the U.S. Supreme Court, holding that discriminatory intent is a question of historical fact, and the clearly erroneous standard of review applies at each step of the *Batson* analysis. *State v. Gregory,* 2001 WI App 107, ¶ 5, 244 Wis. 2d 65, 630 N.W.2d 711; *State v. Lopez,* 173 Wis. 2d 724, 496 N.W.2d 617 (Ct. App. 1992).

¶ 46. However, as pointed out by Lamon, there is an exception, recognized by some courts, to the general rule of giving deference to the lower court. According to this exception, de novo review is appropriate if the trial court judge does not have an opportunity to evaluate credibility. *Holder,* 60 F.3d at 388 (7th Cir. 1995). In *Holder,* the Seventh Circuit Court of Appeals held that when a trial court judge is not in a position to observe the members of the venire as they answered questions in order to make credibility determinations, deference will not be given to the decision and a de novo standard of review is appropriate. *Id.*

---

[7] *See also United States v. Terrazas-Carrasco,* 861 F.2d 93, 94, 5th Cir. (Tex. 1988)(holding that a "clearly erroneous" or "great deference" standard of review is applied in the federal court when reviewing a *Batson* challenge) (internal citations omitted).

¶ 47. In *Holder* the habeas court held a *Batson* hearing eight years after the original voir dire and trial. The habeas judge and the magistrate conducting the *Batson* hearing had not been present at the original voir dire proceeding, and "therefore did not have the opportunity to observe the demeanor of the members of the venire as they answered the questions posed by the attorneys." *Id.* Furthermore, the attorneys had little memory of the actual voir dire. Consequently, the habeas court was in no better position to judge the credibility of the prosecutor or the eliminated jurors than the appellate court. In light of the aforementioned circumstances, great deference to the trial court's decision was not warranted, and the appellate court applied a de novo standard of review. *Id.*

¶ 48. Using *Holder,* Lamon asserts that de novo review is required in this case because the reasons set forth for application of the clearly erroneous standard in *Batson* and *Hernandez* do not apply here. It is argued that Judge Dahlberg was unable to evaluate the credibility of Bell; therefore, the basis of the *Hernandez* rule does not apply.

¶ 49. As noted previously both *Batson* and *Hernandez* state that the trial court's decision enjoys great deference because that judge is in the best position to evaluate the credibility of the juror and the credibility of the prosecutor's proffered reasons for using a peremptory strike.

¶ 50. Like the magistrate in *Holder,* who was unable to evaluate the credibility of the juror, Lamon argues that Judge Dahlberg was not privy to an individual voir dire of Bell. As a result, this court should apply the de novo standard of review in *Holder* when examining prosecutorial or juror credibility.

¶ 51. Conversely, the State argues that the clearly erroneous standard should apply. Great deference should be given to the circuit court judge here because he was present to personally observe and to ascertain the credibility of the attorneys and jurors. The State maintains that *Holder* is not the controlling standard of review for the case at bar, because the procedural circumstances in *Holder* are distinguishable. In *Holder* the *Batson* hearing was conducted eight years after the original voir dire and trial, and the presiding judge and magistrate were not present at the original voir dire. In contrast, here, the circuit court judge was able to oversee the entire voir dire process.

¶ 52. We agree with the State's arguments. Although Lamon attempts to rely on *Holder* in support of her argument that the de novo standard is the appropriate standard of review, *Holder* is procedurally distinguishable and not controlling in this case. *Holder*, 60 F.3d 383.

¶ 53. Unlike the magistrate in *Holder*, the record in this case illustrates that the circuit court judge had sufficient opportunity to examine the credibility of the prosecutor's justifications for the strike. In this case, Judge Dahlberg had other first-hand information concerning the prospective juror along with the opportunity to observe personally Bell's response. *Hernandez* held that it is the province of the trial judge to weigh credibility because of the nature of that position, but did not hold that credibility could *only* be established through hearing personalized voir dire questions and answers. *Hernandez,* 500 U.S. at 365. Moreover, a juror's responses to voir dire may not be the judge's sole piece of information to be weighed in a circuit court judge's evaluation in a *Batson* hearing determination. As previously noted, in the third step of *Batson* the

771

court evaluates the overall credibility of the prosecutor's proffered explanations. Discriminatory intent, if it were present, would emanate from the attorney striking the juror. Hence, the judge's interpretation of the attorney's credibility is a key factor, and any juror's responses would only supplement that decision. In this case the circuit court judge had ample opportunity to weigh the prosecutor's credibility.

¶ 54. This case involves the same type of situation that was present in *Hernandez.* This case involves the striking of a potential juror who is of the same race as the defendant. The circuit court judge in this case was in the best position to evaluate the level of Bollendorf's knowledge of information relating to Bell, in combination with Bell's non-responsiveness to the general voir dire. As in *Hernandez,* the circuit court judge in this case chose to believe the State's race-neutral explanations for the challenge. *Hernandez* held that such a determination was a pure issue of fact under *Batson* and was subject to review under a deferential standard. *Hernandez,* 500 U.S. at 364. In reaching its decision the *Hernandez* Court held that a clearly erroneous standard was in accord with the treatment of that issue in other equal protection cases. *Id.* at 364–70.

¶ 55. It is important to note that an inflexible rule applying a clearly erroneous standard in all cases may be troublesome in certain situations. Therefore, in limited situations where the fact that a member of the venire has not been questioned individually contributes to the totality of the circumstances disproving the credibility of the explanation offered by the prosecution, de novo review may be the appropriate standard, as it was in *Holder.*

772

¶ 56. Lamon is correct that lack of personalized voir dire of a juror may be a factor, which *inhibits* a judge's evaluation of credibility in peremptory challenge explanations. However, inhibiting is not equivalent to removing the ability to determine. A judge could have a basis for making a credibility determination without individualized voir dire. As in this case, a judge could use other pieces of information, or "factors" to determine credibility. Here, the circuit court judge relied on, *inter alia,* Bell's lack of response to general voir dire questions. This appeared to show a lack of candor, when combined with the information in the police report.

¶ 57. As a result, we hold that based on the U.S. Supreme Court's decision in *Hernandez,* the facts of this case require us to give deference to the circuit court. Thus, we will not overturn the circuit court's decision unless we find it to be clearly erroneous.

¶ 58. We hold that under the circumstances of this case the prosecutor was not required to ask individual questions of the stricken juror. The totality of the circumstances here convince us that de novo review is not required.

## V. ARGUMENTS ABOUT RACE-NEUTRAL JUSTIFICATIONS FOR PEREMPTORY STRIKES

¶ 59. Given the long history of racial discrimination in jury selection, Lamon asks this court to reverse the decision of the court of appeals, and remand the case for a new trial.[8]

¶ 60. With regard to step three of the *Batson* test, Lamon maintains the prosecutor, without asking Bell

---

[8] Neither the State, nor Lamon challenges the validity of steps one and two of the *Batson* test. (Pet'r Br. at 7 and 9).

individual voir dire questions, illustrated evidence of modern-day jury selection discrimination. Lamon argues that peremptory challenges cannot be based solely on race, yet Bell was the only African-American in the venire. Lamon argues, *inter alia,* that it is the circuit court's guidance in making the decision to uphold the peremptory strike, rather than the sufficiency of the reasons given by Bollendorf, that must be examined. Lamon asserts that the totality of the circumstance test plus "other factors" established in *Walker* should be used during step three of the *Batson* test because the judge must weigh the totality of the circumstances. (Pet'r Br. at 10) (citing *Walker,* 154 Wis. 2d at 174–175). In support of this argument, Lamon argues that courts in other jurisdictions have held that the failure to voir dire a stricken juror is a *factor* in showing discriminatory intent.

¶ 61. Lamon argues that the State's refusal to conduct individual voir dire of Bell raises the inference that the State knew its race-neutral reasons for the strike would not be supported by the facts. In addition, Lamon maintains that the State's evidence in Exhibit 1, a list of police contacts at Bell's address, was not sufficient to support any proffered race-neutral claims. To the contrary, Lamon claims that the list does not conclusively prove that any arrests or convictions occurred at Bell's address. One contact with someone named Bell was civil in nature and the other ended in a withdrawn complaint. Additionally, Lamon claims that the evidence does not sufficiently prove whether prospective juror Bell lived at that address at the time of any of the listed occurrences. Finally, Lamon contends that Bell is a common name and should not necessitate an assumption of crime association.

¶ 62. Lamon maintains prospective juror Bell did not fail to disclose anything during the general voir dire. The State never specifically asked the venire whether any of them had "contact" with police, yet the State claimed one of the reasons for striking Bell was that he did not respond to questions about having contact with law enforcement officers.

¶ 63. Lamon further contends that the State pre-judged Bell when the State claimed that Bell might not have been forthright if asked follow-up questions. The failure to ask follow-up questions, according to Lamon, is demonstrative evidence of the prosecutor's discriminatory intent.

¶ 64. Next, Lamon argues that both the *Gregory* holding and the findings in the post-conviction motion are contradictory and should be ignored. *Gregory,* 244 Wis. 2d 65. Lamon contends that *Gregory* states that the decision in a *Batson* ruling must be made before the jury is sworn; thus, the State should not be able to rely on the findings of the post-conviction motion. *Id.,* ¶ 14. As such, Lamon argues that reliance on Judge Daniel T. Dillon's post-conviction findings would overrule *Gregory*. Alternatively, Lamon argues that *Gregory* is not applicable to this case because the juror who was struck in *Gregory* was questioned individually.[9]

¶ 65. Beyond the refusal to individually voir dire Bell, Lamon argues that the State's use of certain terms and phrases was discrimination in disguise. For example, Lamon contends that "high crime area" was code

_____

[9] We need not address whether the holding in *Gregory* negates examining the post-conviction motion findings because the findings of that motion by a different circuit court judge are not necessary in determining the outcome of this case.

for "black neighborhood," and "varied employment" was code for "unemployed person."[10]

¶ 66. Moreover, Lamon contends the State's claim that "individual questions for Bell would have singled him out" does not qualify as a race-neutral reason. Lamon notes that the prosecutor singled out white jurors for individual voir dire; therefore, asking Bell questions would not have isolated him.

¶ 67. Finally, given the above arguments, Lamon argues a new trial is warranted because the commission of a *Batson* error is not harmless error. Lamon cites a Second Circuit decision, *Tankleff,* where the court held a *Batson* error is a "structural error," which is not subject to harmless error review. *Tankleff v. Senkowski,* 135 F.3d 235, 248 (2d Cir. 1998).

¶ 68. The State disagrees and asserts that even though the law has expanded to protect against discrimination since *Batson,* the right to exercise peremptory challenges is still protected. Additionally, the State asserts that evidence of a potentially discriminatory or disparate impact is not sufficient to establish a *Batson* violation. To the contrary, discriminatory intent must be proven, and according to *Purkett v. Elem,* 514 U.S.

---

[10] "However, when attempting to prove the reasons given by the prosecutor were pretextual, the focus must be on what the prosecutor knew about the potential juror when he made the strike (citing *Williams v. Chrans,* 957 F.2d 487, 491 (7th Cir. 1992)). Therefore, if a defendant is attempting to prove the prosecutor's reasons for the strike were pretextual, a defendant must show either that the prosecutor intentionally misrepresented the facts he said he relied on or that he had been told those facts but he knew they were erroneous." *State v. Gregory,* 2001 WI App 107, ¶ 14, 244 Wis. 2d 65, 630 N.W.2d 711.

765, 769, 775 (1995), almost any legitimate explanation given for a strike could satisfy the second step of Batson.

¶ 69. The State maintains that Bollendorf gave several race-neutral reasons for using her peremptory strike. Those reasons were based on information obtained before voir dire, and on Bollendorf's observations of Bell during voir dire. The reasons given by Bollendorf for her peremptory strike of Bell included: (1) that her office and the federal prosecutor have prosecuted a number of Bells who live in Beloit through the years, and it is a well-known criminal name in Beloit; (2) that Bell's address is in a high crime area in Beloit, and that the State obtained police reports evidencing police contacts at that address;[11] (3) that Bell's juror card listed his employment as "varies," which goes to his responsibility as a juror; and (4) that Exhibit 1, containing the police contacts at Bell's address, spoke for itself. The State further argued that a lack of response from Bell during the initial voir dire indicated that he may not respond forthrightly with further questioning, and the State didn't want to appear to single him out.

¶ 70. As stated earlier, the third step of *Batson* is the relevant inquiry in this case.[12] In examining that step, *Purkett* held that the burden of persuasion show-

---

[11] These contacts ranged from civil processes to stolen vehicles. The State argued that the Bell in the venire may be related to the people at that address. Moreover, there was a number of police contacts at Bell's address, yet Bell did not answer Bollendorf's question regarding contact with their office or with law enforcement officers. Despite Bell's being listed at the address in Exhibit 1, Bell failed to mention anything about relatives who may have had contacts at his address.

[12] The State points out that Lamon does not take issue with steps one and two of the *Batson* test.

ing a racially motivated strike rests with the opponent of the strike. *Purkett*, 514 U.S. at 767. The State argues, using the totality of the circumstances test, that Lamon did not carry the burden of proving discriminatory intent. The application and outcome of the totality of the circumstances test is determined on a case-by-case basis. The State maintains that the individual reasons given by the prosecutor should be viewed in combination with one another.

¶ 71. In addition, the State argues that Lamon overstates the holding in *Walker* with respect to the totality of the circumstances test. Possible factors that may raise an inference of discrimination could contradict each other. For example, failure to examine a juror or singling a juror out could each be argued to weigh against race neutrality, so it is important to examine the other circumstances surrounding the strike.

¶ 72. Finally, the State relies on the holding in *Davidson*, which held that individual follow-up questions are not required in order to strike a potential juror. *Davidson*, 166 Wis. 2d 35. Accordingly, the statement that the prosecutor believed Bell would not be forthright was based on research combined with Bell's unresponsiveness to general voir dire questions. Hunches are permissible when there is no discriminatory intent, and discriminatory intent must be proven by the opponent of the strike.

## VI. APPLICATION OF THE CLEARLY ERRONEOUS STANDARD TO THE JUSTIFICATION OFFERED

¶ 73. As noted above, this case concerns the third step of the *Batson* test.

¶ 74. Applying the clearly erroneous standard of *Hernandez*, we uphold the decision of the court of

778

appeals that no *Batson* violation occurred. The prosecutor gave credible, race-neutral, reasons upon questioning by the court for her peremptory challenges. In this case the record shows that the prosecutor had done research about Bell, which stands in stark contrast to the prosecutor in *Walker* who struck the only African-American without knowing anything about the juror. *Walker,* 154 Wis. 2d 158.

¶ 75. In *Walker,* the defendant, an African-American, was charged with armed robbery. The jury selection consisted of twenty possible jurors and only one was an African-American. During the voir dire examination of potential jurors, the record in Walker showed that African-American venireperson "did not answer in a way that would suggest a disqualifying attitude to any general questions directed at the pool of jurors by the judge or by the lawyers, nor did the court or counsel ask the [African-American] venireperson any specific questions." *Walker,* 154 Wis. 2d at 164. In seating a twelve-person jury the prosecutor and defense counsel were each allowed to use peremptory challenges to eliminate four of the venirepersons from the pool. The prosecutor in *Walker* used his third peremptory challenge to eliminate the only African-American venireperson. *Id.* On review this court found that the record in *Walker* indicated "that every prosecution witness was white while all alibi witnesses for the defense were [African-American]." *Id.* at 178. Moreover, when asked his reason for the strike, the prosecutor admitted that he struck the African-American venireperson "because he knew nothing about him." *Id.* Upon an independent review of the record, this court found the two reasons provided by the prosecutor for using a peremptory challenge to strike the only African-American venireperson unacceptable. This court said:

779

First, the prosecutor denied that he had a discriminatory motive. The Court in Batson declared that the mere denial of discriminatory intent is not sufficient to rebut an inference of purposeful discrimination. *Batson,* 476 U.S. at 98. Second, the prosecutor explained that, going into the jury selection process for Walker's trial, he only had information about jurors with juror numbers between 841 and 906. The black venireperson had a juror number of 944. The prosecutor thus stated that he struck the black venireperson because he had no information about him. This explanation is unacceptable because it is not "clear and reasonably specific." Moreover, this explanation appears to be pretextual.

*Id.* at 178. Accordingly, this court held that the facts in *Walker* "raise[ed] an inference of purposeful discrimination" on behalf of the prosecutor. *Id.*

¶ 76. Thus, unlike the situation in *Walker,* Bell's lack of response to several questions, in combination with Bollendorf's information on Bell, gave support to Bollendorf's explanation for her peremptory strike of Bell. As noted previously, the U.S. Supreme Court recently addressed the matter of credibility of a prosecutor's reasons for his or her use of a peremptory strike in *Miller-El v. Cockrell* and said: "Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy. *Miller-El v. Cockrell,* 537 U.S. 322, 123 S.Ct. 1029 (2003). The Court held that a state court need not make detailed findings addressing all the evidence before it. *Id.*

¶ 77. Although it may be argued that Judge Dahlberg did not set forth enough reasons for his decision to allow the State's strike to stand, such an argument is weakened by the holding in *Miller-El,* where the Court

held that it was not necessary to make detailed findings so long as the arguments were adequately considered. *Id.*

¶ 78. Determining discriminatory intent under *Batson* simply requires the consideration of the "totality of the relevant facts." *Hernandez,* 500 U.S. at 363; *see also Walker,* 154 Wis. 2d at 173–74, 179.

¶ 79. Turning to the facts of this case, it is undisputed that the only African-American juror was struck from the venire, and the defendant is African-American. However, when questioned by the circuit court judge, the State offered several race-neutral reasons for exercising her peremptory challenge against Bell.

A. Name/Address

¶ 80. When questioned why she struck Bell, Bollendorf explained that the prosecutor's office, as well as the federal prosecuting attorney's office, had prosecuted a number of Bells who live in Beloit. According to Bollendorf, Bell is a well-known criminal name in Beloit. Next, the State noted Bell's address is in a high crime area in Beloit and that the State obtained police reports evidencing police contacts at that address. These contacts ranged from civil processes to stolen vehicles. The State argued that the Bell in the venire may be related to the people at that address and that there were a number of police contacts at Bell's address, yet Bell did not answer the State's question regarding contact with the district attorney's office or with law enforcement officers. Furthermore, he did not mention anything about relatives who may have had contacts, even though, in Exhibit 1, Bells are listed at his address.

¶ 81. The Federal Court for the Western District of Wisconsin held in *Davidson v. Gengler,* 852 F.Supp. 782, 788 (W.D. Wis. 1994) that a prosecutor's knowledge that a challenged juror possessed the same name as known criminals in the area was a race-neutral explanation. Similarly, striking an African-American juror because of a familial relationship to individuals involved in the criminal justice system is a neutral reason to strike a juror. *Id.*

¶ 82. In reaching its decision the *Gengler* court relied on a number of cases. First, the court relied on *United States v. Johnson,* 941 F.2d 1102 (10th Cir. 1991), which held that striking a potential juror, who was African-American, because his brother was once convicted of a crime and because his family history suggested anti-government bias, were race-neutral reasons for a peremptory strike. *Id.* at 1109. Prior family involvement with drug offenses is a race-neutral basis to strike such a potential juror. *United States v. Bennett,* 928 F.2d 1548, 1551 (11th Cir. 1991) superseded by statute as stated in *United States v. Smith,* 127 F.3d 1388, (11th Cir. 1997). *See also United States v. Hughes,* 911 F.2d 113, 114 (8th Cir. 1990) (incarceration of nephew of African-American potential juror is a race-neutral reason for a strike).

¶ 83. Additionally, when a potential juror has the same last name as someone previously convicted by the prosecutor, courts have accepted it as a race-neutral reason for a peremptory strike. *Terrazas-Carrasco,* 861 F.2d at 94–95 n.1.

¶ 84. In *Terrazas-Carrasco* the court of appeals held that the district court was not clearly erroneous in determining that a prosecutor's use of peremptory

challenges to exclude Hispanic veniremen from the jury did not violate defendant's equal protection rights. With respect to the prosecutor's use of peremptory challenges to exclude the Hispanic veniremen, the Fifth Circuit said:

> We "must accept the [inquiring] judge's credibility choice" with respect to the prosecutor's reasons. Valid reasons for exclusion may include "intuitive assumptions" upon confronting a venireman. In *Lance,* we upheld such factors as eye contact, demeanor, age, marital status, and length of residence in the community as valid grounds for peremptory challenge. In this case, the reasons articulated are of the same variety.

*Id.* at 94–95 (citing *United States v. Lance,* 853 F.2d 1177, 1181 (5th Cir. 1988)). In footnote one of *Terrazas-Carrasco* the court stated that the valid, race-neutral reasons articulated for the peremptory strike in that case "include *having the same last name as someone previously convicted by the prosecutor;* age; eye contact; and body language." *Id.* at 95 n.1 (emphasis added).

¶ 85. Along with names, addresses may provide an acceptable race-neutral justification for a peremptory strike. As noted by the State in its brief, case law is quite clear that location of a venireperson's residence provides a race-neutral reason for a peremptory strike when a residential location has some relationship to the facts of the case. (Resp't Br. at 22 n.3). For example, in *United States v. Briscoe,* the court upheld a peremptory strike where prosecutor's explanation "went well beyond a cursory statement that Mr. Jeffries resided on the west side of Chicago." *United States v. Briscoe,* 896 F.2d 1476, 1488 (7th Cir. 1990). However, courts have recognized that allowing the exclusion of African-American venirepersons simply because they live or

783

work in an area frequented by gangs has "an enormous potential to disproportionately exclude black jurors in most cases involving black gang members." *Williams v. Chrans,* 957 F.2d 487, 489–90 (7th Cir. 1992). With respect to the issue of resident location, the Ninth Circuit said: "[w]hat matters is not whether but how [a] residence is used." *United States v. Bishop,* 959 F.2d 820, 826 (9th Cir. 1992).

¶ 86. In support of the proffered race-neutral reasons for the peremptory strike the State introduced Exhibit 1 during the *Batson* hearing. Exhibit 1 listed several law enforcement contacts at the address that Bell had listed in his juror questionnaire. One of those contacts involved a complaint about a stolen vehicle and parties who were named Bell. Accordingly, Exhibit 1, like the case in *Briscoe,* explained the nature and previous use of the residence, which went beyond a "cursory statement" that Bell simply lived in a high crime area. *Id.*

B. Juror Veracity

¶ 87. Furthermore, the State argued that Exhibit 1, coupled with Bell's lack of response, indicated that he may not respond forthrightly to further voir dire questions directed to him. Bell's failure to disclose during voir dire any police contacts at his residence is a plainly race-neutral justification for striking him. *See Coulter v. Gilmore,* 155 F.3d 912, 919–20 (7th Cir. 1998) (calling the prosecutions striking of two venirepersons because they failed to disclose that they had been previously charged with crimes "legitimate and non-discriminatory"). *See also Baldwin v. State,* 732 So.2d 236, 243 (Miss. 1999) (prosecutor's explanation that

784

venirepersons lived in high drug trafficking areas and had family members who had been convicted of crimes found to be race-neutral).

## C. Not Wanting to Single Him Out

¶ 88. The defense maintains that Bollendorf could have asked Bell individual questions on voir dire. Bollendorf stated that she did not want to appear to single Bell out. While the lack of personalized voir dire of a juror may inhibit a judge's evaluation of the attorney's credibility in peremptory challenge explanations, inhibiting is different than eliminating the opportunity to determine credibility altogether.

¶ 89. Questioning or failing to question a potential juror presents a problematic tautology. Failing to examine a juror, or conversely singling out a juror, can be equally argued to weigh against a race neutral justification for a peremptory strike. In *Gengler* the court held that a prosecutor was allowed to rely on information other than individual voir dire to provide a basis for his race neutral explanation. *Gengler,* 852 F. Supp. at 789. According to *Gengler* individual follow-up questions on voir dire are not required in order to strike a potential juror. In this case the refusal to conduct individualized voir dire of Bell may be an isolated factor arguably evidencing discriminatory intent. However, this factor alone is not conclusive of discrimination during jury selection. In light of the totality of the circumstances, the numerous race-neutral reasons proffered by the State outweigh any alleged discriminatory intent resulting from the failure to question Bell further.

## D. Unemployment

■

¶ 90. The State also explained that Bell's juror card listed his employment as "varies," which goes to his responsibility as a juror. The Seventh Circuit has held that unemployment may provide a sufficiently race-neutral explanation for a strike. *United States v. Lewis,* 117 F.3d 980, 983 (7th Cir. 1997). In reaching that decision the court in *Lewis* relied on cases which recognize unstable employment, or unemployment status, as sufficient race-neutral explanations for a peremptory strike. *Id.* (citing *United States v. Hunter,* 86 F.3d 679, 683 (7th Cir. 1996), *cert. denied,* 519 U.S. 985, 117 S.Ct. 443, 136 L.Ed.2d 339 (1996) and *United States v. Hughes,* 970 F.2d 227, 230–31, (7th Cir. 1992)). *See also United States v. Jackson,* 914 F.2d 1050, 1052–53 (8th Cir. 1990); *State v. Hernandez,* 170 Ariz. 301, at 305, 823 P.2d 1309 (1991).

## E. Totality of the Circumstances

■

¶ 91. It is clear from the record that the evidence in Exhibit 1, as well as clear case law, supported Bollendorf's explanations for her peremptory strike. Bollendorf relied on a detailed police report of contacts at Bell's address, along with her personal knowledge of prosecutions against other persons named Bell, and her observations of Bell and his answers during voir dire. Based on the race-neutral reasons offered by Bollendorf for her peremptory strike, we find that Lamon did not meet the burden of proof required to show that the State's reasons were not race-neutral. Accordingly, we affirm the court of appeals' decision and hold that the decision of circuit court in allowing the strike to stand

was not clearly erroneous. As a result, we find no error and need not engage a harmless error analysis.

## VII. CONCLUSION

¶ 92. In summary, we affirm the court of appeals' decision. The decision of the circuit court was not clearly erroneous when it determined that the State's reasons for striking the juror were race-neutral; and, therefore, allowed the peremptory strike of Bell to stand. The State listed several acceptable race-neutral reasons for its strike of Bell and provided a detailed police report of contacts at Bell's address in support of its reasons for the strike. Although the State did not individually question Bell further, *Davidson* instructs that such questioning is not necessary. Furthermore, under the totality of the circumstances test, any alleged discriminatory intent evidenced by the prosecutor's decision not to question Bell individually, was out-weighed by the race-neutral explanations offered.

¶ 93. Based on well-settled law, we accord defer-ence to the decision of the circuit court in this case and hold it was not clearly erroneous to accept the reasons offered by the State in justification for its peremptory strike.[13]

*By the Court.*—The decision of the court of appeals is affirmed.

---

[13] Contrary to the hyperbole of the dissent, we do not "ignore[] well-established case law." (Dissent, ¶ 94). Rather, we have applied the relevant case law from the U.S. Supreme Court, the court of appeals, and this court to the facts and issues presented.

The dissent would have us strip away the deference due to the circuit court's determinations (Dissent, ¶ 99) as outlined in *Hernandez,* 500 U.S. at 364, and would, in effect, eliminate the

787

¶ 94. SHIRLEY S. ABRAHAMSON, CHIEF JUS-
TICE *(dissenting)*. The majority ignores well-
established case law. In so doing, the majority prohibi-
tively raises the bar for a defendant raising a *Batson*
challenge, lowers the bar for circuit courts that conduct
*Batson* hearings, and neglects its duty to review circuit
court determinations that no *Batson* violation has oc-
curred, rendering the Constitution's prohibition on the
exclusion of persons from jury service on account of
race an illusion in Wisconsin courts. I therefore dissent.

¶ 95. Justice Thurgood Marshall, concurring in
*Batson v. Kentucky*, 476 U.S. 79 (1986), warned that the
*Batson* decision would not effectively eliminate dis-
crimination in the selection of juries if prosecutors'
easily asserted race-neutral explanations were simply
accepted at face value.[1] Justice Marshall explained:

> Any prosecutor can easily assert facially neutral rea-
> sons for striking a juror, and trial courts are ill
> equipped to second-guess those reasons. How is the
> court to treat a prosecutor's statement that he struck a
> juror because the juror had a son about the same age as
> the defendant, or seemed "uncommunicative," or "never
> cracked a smile" and, therefore, "did not possess the

defendant's ultimate burden of persuasion (Dissent, ¶ 128).
The burden would be placed on the circuit court, not on the
defendant.

The dissent has forgotten the importance of peremptory
challenges, and how significant such challenges are in further-
ing the purpose of eliminating extremes of partiality on either
side of a case. As noted earlier, the United States Supreme
Court has characterized peremptory challenges as "essential to
the fairness of trial by jury." *Batson*, 476 U.S. at 107 (Marshall,
J. Concurring)(citing *Lewis v. State*, 146, U.S. at 376, 13 S.Ct. at
138).

[1] *Batson v. Kentucky*, 476 U.S. 79, 105 (1986) (Marshall, J.,
concurring).

sensitivities necessary to realistically look at the issues and decide the facts in this case"? If such easily generated explanations are sufficient to discharge the prosecutor's obligation to justify his strikes on nonracial grounds, then the protection erected by the Court today may be illusory.[2]

¶ 96. The majority today approves of the very behavior against which Justice Marshall warned.

¶ 97. The circuit court in the present case did not fulfill its duty under the third step of the *Batson* analysis. It upheld the prosecutor's peremptory strike of Dondre Bell, the lone African-American on the venire, without looking beneath the surface of the prosecutor's race-neutral reasons for striking him and without considering the totality of the circumstances surrounding jury selection. It summarily concluded that the State "made its case" without any analysis or findings of fact on the ultimate issue of whether the State discriminated when it struck Bell.

¶ 98. Instead of holding the circuit court to its duty, the majority rubber stamps the circuit court's conclusion under the guise of deference. Moreover, the majority misconstrues the law to hold that the mere ability to assert easily generated, facially neutral reasons for striking a juror discharges the State's constitutional obligation to select a jury without discriminating on the basis of race, thereby lowering the bar for circuit courts that conduct *Batson* hearings and raising the bar for defendants bringing a *Batson* challenge.

¶ 99. This case should be remanded to the circuit court for a proper *Batson* hearing. First, the law is clear that the circuit court has a duty under the third step of

---

[2] *Batson,* 476 U.S. at 106 (Marshall, J., concurring) (citations omitted).

the *Batson* inquiry to consider all of the relevant facts surrounding jury selection and to determine whether the defendant has met her burden of proving purposeful discrimination based on race. Second, since there is no evidence in this case that the circuit court fulfilled its duty, the deference normally due its determination is inappropriate here. The majority opinion, far from recognizing this fact, fails in its own duty to properly review the decision of the circuit court. Third, had either the circuit court or the majority bothered to look, there are ample warning signs in this case that the prosecutor's actions were driven by the race of the struck venire member and were thus unconstitutional. A prosecutor's historical privilege of peremptory challenge free of judicial control is limited by the constitutional prohibition on exclusion of persons from jury service on account of race.[3]

I

¶ 100. This case involves step three of the *Batson* analysis. Under *Batson,* three steps must be taken for the defendant to successfully prove that the State's peremptory challenge of Bell violated her constitutional right to equal protection: (1) the defendant must make a prima facie showing that the prosecution has exercised peremptory challenges on the basis of race; (2) if the defendant satisfies this threshold, the burden then shifts to the prosecution to articulate a race-neutral justification for the disputed challenges; and (3) if a race-neutral explanation is tendered, the court has a duty to determine whether, in light of the proffered justification, the defendant has satisfied the burden of proving purposeful discrimination.

---

[3] *Batson,* 476 U.S. at 91.

¶ 101. No dispute exists in the present case that the defendant made a prima facie showing of discrimination against a black juror under the first step of the *Batson* analysis. Likewise, no dispute exists in this case that the State articulated race-neutral reasons for challenging the lone black juror under the second step of the *Batson* analysis. The issue presented in this case is whether the circuit court properly determined whether the defendant met her burden of establishing purposeful discrimination under the third step in the *Batson* analysis.

¶ 102. The majority opinion, however, never decides whether the circuit court properly exercised its discretion under *step three* of the *Batson* analysis. The majority errs by conflating the second and third steps of the *Batson* analysis and by concluding that the State's satisfaction of step two is sufficient, in and of itself, to defeat a charge of purposeful discrimination. The majority opinion concludes, "[B]ased on the race-neutral reasons offered by [the prosecutor] for her peremptory strike, we find that [the defendant] did not meet the burden of proof required to show that the State's reasons were not race-neutral."[4] Furthermore, the majority opinion holds, "The decision of the circuit court was not clearly erroneous when it determined that the State's reasons for striking the juror were race-neutral; and, therefore, allowed the peremptory strike of Bell to stand."[5] The majority's conclusions simply affirm what both parties have already conceded: the State's proffered reasons for striking Bell were race-neutral.

---

[4] Majority op., ¶ 91.

[5] *Id.,* ¶ 92.

¶ 103. The step three determination under *Batson* requires more than a conclusion that a prosecutor has put forth race-neutral reasons for striking a particular juror.[6] At step three, the circuit court is charged with testing those proffered reasons. A reason that appears on its face to be race-neutral may turn out to be, upon further examination, a pretext for racial discrimination. Similarly, a prosecutor may provide a reason that is in fact race-neutral, but that upon further examination is revealed not to be the actual reason that the prosecutor struck the potential juror.[7] It is at the third step that the "persuasiveness of the [race-neutral] justification becomes relevant—the step

---

[6] The Seventh Circuit, in *Coulter v. Gilmore*, 155 F.3d 912 (7th Cir. 1998), explained:

> A facially neutral reason for striking a juror may show discrimination if that reason is invoked only to eliminate African-American prospective jurors and not others who also have that characteristic. . . . [A] procedure that omits the [step three] totality inquiry would exonerate the user of peremptories in virtually every case, unless the lawyer was foolish enough to announce her discriminatory purpose in so many words. *Batson* requires more . . . .

*Id.* at 921 (citations omitted).

[7] *See, e.g., Turner v. Marshall*, 121 F.3d 1248, 1255 (9th Cir. 1997) (refusing to accept a list of neutral reasons at face value where they were unsupported or refuted by record); *Davidson v. Harris*, 30 F.3d 963, 966 (8th Cir. 1994) (party's justification that African-American juror was likely to be sympathetic to the opposing party because she had young children was pretextual because white jurors with young children were seated on the jury); *Jones v. Ryan*, 987 F.2d 960, 973 (3d Cir. 1993) (prosecutor's explanation that he struck African-American juror because she had a son the same age as the defendant was pretextual when white jurors with children of the same age were seated).

in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination."[8] At the third step, "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination."[9]

¶ 104. The touchstone for the third step of the *Batson* inquiry is the credibility of the prosecutor: Does the circuit court believe that the prosecutor's race-

---

[8] *Purkett v. Elem,* 514 U.S. 765, 768 (1995).

[9] *Id.* The majority opinion omits the three words "and probably will" when quoting this passage, subtly removing the Supreme Court's emphasis on the likelihood that such fantastic reasons will not be considered sufficient under step three of *Batson. See* majority op., ¶ 32. Moreover, immediately after the majority opinion quotes this passage, it incorrectly asserts that "in addition to accepting 'silly,' 'superstitious' justifications for striking a juror, intuitive strikes have been upheld as valid strikes" under step three. Majority op., ¶ 33. The cases the majority relies upon for this proposition, *United States v. Terrazas-Carrasco,* 861 F.2d 93, 94–95 (5th Cir. 1988), and *United States v. Williams,* 934 F.2d 847, 850 (7th Cir. 1991), are not cases involving a *Batson* step three analysis.

In *Williams,* for example, the Seventh Circuit held only that "intuitive assumptions that are not fairly quantifiable" are valid race-neutral reasons that a prosecutor may offer for excluding a juror at stage two, not that they are valid under step three. *Williams,* 934 F.2d at 850. No *Batson* violation occurred in *Williams* because the district court "considered [the prosecutor's] explanation in light of of the circumstances of that particular case and concluded that the explanation was credible"—the stage three analysis. *Id.* Thus, *Williams* does not stand for the proposition that silly, superstitious, or intuitive race-neutral reasons for a peremptory strike are constitutionally valid. Rather, *Williams* stands for the proposition that such explanations satisfy the State's burden to provide a race-neutral reason at step two of the *Batson* analysis.

neutral explanation is genuine?[10] As the U.S. Supreme Court has made clear, in many cases, the "best evidence often will be the demeanor of the attorney who exercises the challenge."[11]

¶ 105. That said, however, an attorney's demeanor is far from the only evidence that a circuit court is obligated to consider under *Batson*'s third step.[12] "A prosecutor's motive may be inferred from the totality of the relevant facts."[13]

¶ 106. The third step of the *Batson* analysis therefore imposes a "duty"[14] on the circuit court to consider the "totality of the circumstances" surrounding jury selection in a given case.[15] A circuit court faced with a

[10] *Hernandez v. New York,* 500 U.S. 352, 365 (1991).

[11] *Id.*

[12] In *State v. Walker,* 154 Wis. 2d 158, 173–75, 453 N.W.2d 127 (1990), this court concluded that a court's duty to analyze "all relevant circumstances" includes consideration of:

[W]hether the prosecution has eliminated all members of the defendant's race from the panel of prospective jurors; whether the race of the defendant or his or her witnesses is different than the race of the victim or the state's witnesses; whether the excluded jurors sharing the defendant's race responded to any questions of the judge or the lawyers in a manner that made them suitable candidates for exclusion by the prosecutor; how many venirepersons share defendant's race; and the nature of the crime.

[13] *McLain v. Prunty,* 217 F.3d 1209, 1220 (9th Cir. 2000).

[14] *Batson,* 476 U.S. at 98.

[15] *United States v. Hill,* 146 F.3d 337, 342 (6th Cir. 1998) ("At this [third] step of the analysis, the district court has the responsibility to assess the prosecutor's credibility under all of the pertinent circumstances, and then to weigh the asserted justification against the strength of the defendant's prima facie case under the totality of the circumstances."); *United States v. McMillon,* 14 F.3d 948, 953 n.4 (4th Cir. 1994) ("If [the step two] burden is met, the court then addresses and evaluates all

*Batson* challenge is charged with examining the "entire res gestae" of the jury selection process;[16] when determining whether a prosecutor acted with purposeful discrimination, a circuit court must undertake a "detailed analysis" of "all of the evidence."[17] As the Seventh Circuit has explained, "One way or another, a trial court must consider all relevant circumstances before it issues a final ruling on a defendant's [*Batson*] motion."[18]

evidence introduced by each side (including all evidence introduced in the first and second steps) that tends to show that race was or was not the real reason and determines whether the defendant has met his burden of persuasion."); *see also State v. Gregory,* 2001 WI App 107, 244 Wis. 2d 65, 630 N.W.2d 711 (Vergeront, J., dissenting):

> [T]he third step in the *Batson* analysis is not satisfied by a conclusory statement that the prosecutor's explanation is race-neutral. At the third step, the trial court has the duty to determine if the defendant has established purposeful discrimination. The duty of assessing the credibility of the prosecutor's race-neutral reasons embodies the "decisive question" in the *Batson* analysis, and requires the trial court to consider all the facts and circumstances.

*Id.* ¶ 24 (citations omitted).

The majority correctly explains that a circuit court must consider the "totality of the circumstances" when determining whether the State discriminated in the exercise of its peremptory strikes. Majority op., ¶ 80 (quoting *Hernandez v. New York,* 500 U.S. 352, 363 (1991). The majority errs, however, when it asserts that this duty can be fulfilled "simply." *Id. See also United States v. Stavroulakis,* 952 F.2d 686, 696 (2d Cir. 1992) (disapproving of a trial court's conducting its review of a *Batson* application with undue haste and ruling in a summary fashion).

[16] *United States v. Armstrong,* 517 U.S. 456, 467 (1996).

[17] *Coulter,* 155 F.3d at 920.

[18] *Id.* at 921 (citing *Batson,* 476 U.S. at 96–97).

¶ 107. Moreover, a circuit court's examination of the totality of the circumstances should include, whenever possible, an evaluation of "the differential manner in which the State" interacted with minority and non-minority jurors, since the "crucial and determinative inquiry" in a *Batson* claim is whether similarly situated venirepersons have been treated differently based upon race.[19] For example, in its most recent decision discussing *Batson,* the United States Supreme Court identified disparate questioning by a prosecutor, that is, a prosecutor's altering the way a question asked of all venire members is asked of African-American venire members, as "evidence of purposeful discrimination" when a defendant raises a *Batson* claim.[20]

---

[19] *Coulter,* 155 F.3d at 921; *Turner v. Marshall,* 121 F.3d 1248, 1251–52 (9th Cir. 1997) ("A comparative analysis of jurors struck and those remaining is a well-established tool for exploring the possibility that facially race-neutral reasons are a pretext for discrimination."); *Doss v. Frontenac,* 14 F.3d 1313, 1316–17 (8th Cir. 1994) ("It is well-established that peremptory challenges cannot be lawfully exercised against potential jurors of one race unless potential jurors of another race with comparable characteristics are also challenged.").

[20] *Miller-El v. Cockrell,* 537 U.S. 322, 123 S. Ct. 1029, 1043 (2003). The Court also explained that statistical evidence of the disproportionate number of strikes used against African-American venire members, historical evidence of racial discrimination by a district attorney's office, and the decision to request a "jury shuffle" when a predominate number of African-Americans were seated in the front of the jury panel provided further evidence for a court to consider when determining whether a *Batson* violation had occurred. *Miller-El,* 123 S. Ct. at 1043–44.

The State, in its brief, asserts that Wisconsin need not adopt a list of factors to be considered during the third step of the *Batson* analysis, like a number of southern states have done,

¶ 108. In short, under step three, the circuit court had a duty to examine all the relevant facts and the totality of the circumstances surrounding jury selection before making an express determination as to whether the defendant has satisfied the burden of proving discrimination. The demeanor of the prosecutor when announcing race-neutral reasons for exercising a peremptory strike is merely one piece of evidence for the circuit court to consider.

II

¶ 109. In the present case, there is no evidence in the record that the circuit court fulfilled its step three duty under *Batson*.[21] In a single, conclusory sentence the circuit court ruled, "Well, I think the State has made

---

because Wisconsin does not share the history of institutionalized race discrimination experienced by those jurisdictions. The State points to the recent Wisconsin Public Trust and Confidence in the Justice System Study as evidence of Wisconsin's good record on racial equality, noting that the study "did not identify discriminatory peremptory strikes as a cause for concern or remedial action." (State's Br. at 20). What the State does not mention is that participants in focus groups "said that race and class matter [in the court system]. There is a feeling that it would be difficult, if not impossible, to escape bias in the justice system because bias permeates all levels-law enforcement, attorneys, judges, juries, and corrections officials." *Public Trust & Confidence in the Justice System: The Wisconsin Initiative* (October 2000), http://www.wisbar.org/bar/ptc/ptcap.html. I do not consider it significant that citizen respondents did not specifically identify "discriminatory peremptory strikes" as a reason, given this general finding.

[21] Both the majority opinion and the State's brief acknowledge the ambiguity of the circuit court's ruling. The majority writes: "The circuit court found that Bollendorf had just cause for the peremptory strike, but did not elaborate on its decision. As a result, Bollendorf's peremptory strike was allowed to

its case and it does have just cause for the strike." It made no findings of fact and reached no conclusions of law relevant to the *Batson* inquiry; it made "no effort to comply with the letter, much less the spirit, of *Batson*."[22]

¶ 110. When the circuit court concluded that the State "made its case," did it mean that the State provided race-neutral reasons? If so, which reasons provided by the State were race-neutral? Were any of them credible? When the circuit court concluded that the State had "just cause for the strike," did it mean that the State did not act with purposeful discrimination? "The limited record developed in the present case casts doubt on the trial court's ability to make the required finding regarding the prosecutor's intent, thereby undermining the deference due its conclusion."[23] Thus the decision in the present case cannot be properly reviewed and the case must be remanded.[24]

---

stand." Majority op., ¶ 16. Similarly, the State noted in its brief, "Before reaching [his] summary conclusion, Judge Dahlberg did not expressly confirm that Assistant District Attorney Bollendorf had proffered race-neutral explanations for striking Bell." (State's Br. at 5).

[22] *Jordan v. Lefevre,* 206 F.3d 196, 201 (2d Cir. 2000).

[23] *Id.*

[24] *See, e.g., Jordan v. Lefevre,* 206 F.3d 196, 201 (2d Cir. 2000) ("[T]he limited record developed in the present case casts doubt on the trial court's ability to make the required finding regarding the prosecutor's intent, thereby undermining the deference due its conclusion."); *United States v. Hill,* 146 F.3d 337, 342 (6th Cir. 1998) ("Without a fuller indication of the circumstances that apparently led the district court to this conclusion, however, we cannot properly review the decision.").

¶ 111. Nothing. in the circuit court's determination demonstrates that the circuit court looked beyond the State's proffered reasons in "making its case" and nothing demonstrates that the court considered the totality of the circumstances, all the relevant facts, or the entire res gestae of the jury selection process.[25] The U.S. Supreme Court has held that a trial court need not make detailed findings addressing all the evidence before it, but *Batson* does require that a trial judge make an "ultimate determination on the issue of discriminatory intent"[26] and that the court adequately

---

[25] The relationship between a court's "duty" and the opponent of the strike's "burden" under *Batson* is not unlike the relationship this court has created between a court's "obligation" and the beneficiary of an error's "burden" in harmless error review. It is well established in Wisconsin that the beneficiary of an error during trial has the burden of proving that the error was harmless, that is, that it is true beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. *See State v. Vanmanivong,* 2003 WI 41, ¶ 40, 261 Wis. 2d 202, 661 N.W.2d 76 (citing *State v. Harvey,* 2002 WI 93, ¶¶ 40–41, 254 Wis. 2d 442, 647 N.W.2d 189) (citing *State v. Dyess,* 124 Wis. 2d 525, 543, 370 N.W.2d 222 (1985))). Yet it is also true that the harmless error rule is an injunction on courts requiring that a court address the harmless error rule regardless of whether the parties do. *Harvey,* 254 Wis. 2d 442, ¶ 47 n.12 (citing Wis. Stat. § 805.18(2)). Similarly, under *Batson,* even though the burden of proving purposeful discrimination is on the opponent of the strike, a court has "the duty to determine if the defendant has established purposeful discrimination." *Batson,* 476 U.S. at 98.

Here, the circuit court did not address whether the prosecutor's proffered reasons were pretextual. The circuit court ruled summarily after a brief colloquy and did not properly conduct the third *Batson* step.

[26] *United States v. Alvarado,* 923 F.2d 253, 256 (2d Cir. 1991).

consider all of the relevant information and the totality of the circumstances.[27] The circuit court in the present case did not fulfill its duty under the third step of *Batson,* and a circuit court commits error when it denies a *Batson* motion without making the proper step three determination.[28] This error undermines the deference due the circuit court.

¶ 112. Furthermore, the majority opinion here fails in its duty to review the decision of the circuit court. The majority is correct that under *Hernandez v. New York,* 500 U.S. 352, 364 (1991), a circuit court's determination whether a prosecutor intended to discriminate on the basis of race in challenging a prospective juror is a question of historical fact that is entitled to deference. In *Miller-El v. Cockrell,* 537 U.S. 322 (2003), however, the U.S. Supreme Court explained, "deference does not imply abandonment or abdication of judicial review. Deference does not by definition

---

[27] *See Riley v. Taylor,* 277 F.3d 261, 291 (3d. Cir. 2001) ("Although the state court is not required to comment on all of the evidence before it, an adequate step three *Batson* analysis requires something more than a terse, abrupt comment that the prosecutor has satisfied *Batson.*").

[28] *United States v. Thomas,* 320 F.3d 315, 320 (2d Cir. 2003); *see also Riley v. Taylor,* 277 F.3d 261, 287 (3d Cir. 2001):

The state courts in this case rejected Riley's *Batson* claim without discussing any of the ample evidence that throws into question the explanations offered by the prosecutor for striking two of the black jurors and there is nothing relevant in the record that might otherwise support the state courts' decisions. Thus, we do not know why the state courts found the State's explanation was plausible and credible in light of the other evidence. It is because of the state courts' omission of a requirement under the third step of the *Batson* inquiry—of an ultimate determination on the issue of discriminatory intent based on *all* the facts and circumstances —that the State's argument founders.

preclude relief."[29] Furthermore, the *Miller-El* Court emphasized that appellate review includes a search for "any evidence demonstrating that, despite the neutral explanation of the prosecution, the peremptory strikes in the final analysis were race based."[30]

¶ 113. As discussed above, the majority opinion's review of the circuit court's step three analysis in this case is actually an examination of the circuit court's step two analysis. Instead of analyzing whether the circuit court erroneously determined that the State did not violate the equal protection clause of the Constitution when it struck Bell from the venire, the majority opinion explains that the defendant's prima facie case was rebutted when "the State offered several race-neutral reasons for exercising her peremptory challenge against Bell."[31] And, instead of reviewing all of the relevant circumstances in the record that might bear on the final analysis of whether the peremptory strike of Bell was race based, the majority examines only the extent to which each of the prosecutor's proffered reasons, in a vacuum, was properly considered race-

[29] *Miller-El,* 123 S. Ct. at 1042 (referring to review in the context of habeas relief under Antiterrorism and Effective Death Penalty Act, where the deference given to trial courts is even greater).

[30] *Miller-El,* 123 S. Ct. at 1042 (referring to examination of a *Batson* claim in the context of a request for a certificate of appealability); *see also Riley v. Taylor,* at 286 ("Deference in a *Batson* case must be viewed in the context of the requirement that the state courts engage in the three-step *Batson* inquiry.").

[31] Majority op., ¶ 79.

neutral.[32] It did not, as *Miller-El* requires, search for any evidence that the peremptory strike in the final analysis was race-based.

¶ 114. The majority also errs when it focuses exclusively on the circuit court's assessment of the prosecutor's subjective state of mind when offering race-neutral explanations for her strike. The burden in a *Batson* challenge is on the defendant, and ultimately it is the objective evidence in the record that must persuade the circuit court that a race-neutral reason is either pretextual or disingenuous. "Frequently the most probative evidence of intent will be objective evidence of what actually happened;"[33] an explanation that is contrary to the objective facts is a sure sign of disingenuousness or pretext. Only by balancing the prosecutor's expressed subjective intent against the totality of the relevant objective evidence can a circuit court make its step three determination.

¶ 115. In sum, the circuit court did not look beyond the State's proffered reasons. It did not consider the totality of the circumstances. It made no findings of

---

[32] *See* majority op., ¶¶ 80–91. Moreover, the majority imputes some of its own conclusions to the circuit court, in an effort to bolster the circuit court's determination. For example, the majority asserts that "[h]ere, the circuit court judge relied on, inter alia, Bell's lack of response to general voir dire questions" and that this silence "appeared to show a lack of candor, when combined with the information in the police report" when determining if the prosecutor's explanations were credible. Majority op., ¶ 56. There is no evidence in the record that the circuit court even noticed that Bell did not respond to any questions asked during voir dire, let alone whether the circuit court drew the conclusion from this silence that Bell was being less than honest.

[33] *Washington v. Davis,* 426 U.S. 229, 253 (1976) (Stevens, J., concurring).

fact and made no ultimate determination on the issue of discriminatory intent. The circuit court's conclusory statement, "Well, I think the State has made its case and it does have just cause for the strike," is thus not entitled to the deference usually accorded step three *Batson* findings. The majority opinion, inappropriately focusing on step two of the *Batson* analysis, completely misses the point.

## III

¶ 116. A close examination of the record—an examination that includes consideration of the totality of the circumstances—reveals some disturbing information about jury selection in the present case. In short, there are glaring signs in the record that Bell, the lone African-American juror on the venire, was singled out and treated differently than all other jurors, in part because of his race. Consequently, had the circuit court engaged in the inquiry demanded by *Batson,* it might have reached a different conclusion.

¶ 117. The State admits that the day before jury selection in the present case, it requested a report from the Beloit Police Department listing police contacts at Bell's address. There is no suggestion or indication that the prosecutor made a similar request for any other member of the venire. We do know, however, that it is not standard practice for Rock County assistant district attorneys to run police checks on the addresses of potential jurors.[34]

---

[34] In *State v. Gregory,* 2001 WI App 107, 244 Wis. 2d 65, 630 N.W.2d 711, a Beloit prosecutor struck the very same potential juror, Dondre Bell, the day after he was struck from the venire in the present case. Bell was the lone African-American on that venire as well. The prosecutor justified her strike, in part,

¶ 118. More importantly, by virtue of this police report, Bell became the only member of the venire for whom silence during voir dire created grounds for being struck due to lack of candor.[35] The prosecutor asked a handful of questions during voir dire to uncover whether any of the venire members should be struck for cause or through her peremptory strikes. All of the questions were designed so that affirmative answers raised concerns and a venire member's silence meant that the prosecutor should not be concerned.[36] For Bell, however, the exact opposite was true. The police report gave the prosecutor additional information about Bell that permitted her to construe his silence as "not being completely honest."[37]

---

because she "had received information from another assistant district attorney that police had responded to 1216 Wisconsin Avenue, Bell's residence, seventeen times between January 1996 and October 1998." *Id.* at ¶ 9. Clearly it is not a common practice that police checks are made for every juror in every case.

[35] More than just creating an avenue for gauging dishonesty, the police report made it possible for the prosecutor to strike Bell regardless of his answers during voir dire. She set him up. Had he answered affirmatively to the question whether he knew somebody who had been convicted of a crime, the prosecutor would have had grounds to use a peremptory strike against him. Had he failed to answer that question, as he did here, the prosecutor could use the police report as grounds for striking him. No other juror was destined to be struck in advance of voir dire as a result of pretrial actions taken by the prosecutor.

[36] *See* majority op., ¶ 10.

[37] It is worth explaining that Bell did not, in fact, evidence any dishonesty by his failure to respond. The prosecutor asked three specific questions about crime of the entire venire for which the police report might be used to indicate that Bell's

¶ 119. This case, therefore, is a classic case of disparate questioning with a slight twist. The prosecutor altered the way she would perceive the answers given by Bell as opposed to the way she would perceive the same answers from all other venire members. Indeed, Bell, like more than half of the venire members, sat silently through the prosecutor's questions, but he

silence was dishonesty. She asked whether (1) anyone had had contact with the prosecutor's office; (2) anyone had a close friend or relative who had been a victim of crime; and (3) anyone had a close friend or relative who had been convicted of a crime.

The police report does not indicate that anybody living at Bell's address has ever been arrested, convicted, or prosecuted for a crime. It does not indicate that Bell, the venire member, lived at the address during the time of any of the police contacts. It does not show that Bell, the venire member, is related to anyone involved in the incidents leading to police contact. In fact, the defendant in *Gregory,* 244 Wis. 2d 65 (Ct. App. 2001) (a case in which Bell, again the lone African-American on the venire, was struck from the venire based on the same police report), submitted a written offer of proof that Bell would testify that

> he is not related to convicted cocaine dealer Christopher Bell; that he did not live at 1216 Wisconsin Avenue between September, 1995 and May, 1997 because he was attending college in Marshall, Minnesota; that if there were any police contacts at all with 1216 Wisconsin Avenue during that period he was unaware of them; and that he spent a week on jury duty in April, 1999 and was struck from several jury panels.

*Gregory,* Appellant's Br. at 9.

Thus, the prosecutor's decision to strike Bell out of a concern that he would be dishonest was, as she admitted during the *Batson* hearing, merely an assumption, not a decision based on fact.

was the only silent venire member who was peremptorily struck by the prosecutor.[38]

¶ 120. The circuit court did not pay any attention to this information before it. The circuit court never considered that the prosecutor had not obtained police reports for any of the other venire members or any of the other listed addresses for the venire members.[39] The circuit court never considered whether there was reason to infer a lack of candor or dishonesty from the silence of any of the other eleven silent venire members.[40] Neither does the majority opinion. In fact, the majority opinion commends the prosecutor, without flinching, for relying on the police report.[41]

---

[38] The record reveals that the venire in this case consisted of 20 people and that eleven jurors aside from Bell sat silently through the entire jury selection. Bell was the only juror who sat silently who was struck by the prosecutor.

[39] If a police check was run on other jurors as well, what did the police reports indicate? Did any of those jurors have contact with the police that they did not admit during voir dire?

[40] The record does not reveal whether any other members of the venire had indicated that they were unemployed or that their employment "varies." *See Wylie v. Vaughn,* 773 F. Supp. 775, 777 (E.D. Pa. 1991):

> Because there is a far greater percentage of unemployed minorities than there are unemployed persons in the general population, giving prosecutors carte blanche to strike jurors simply because they are unemployed creates a far smaller pool of potential minority jurors. . . . Peremptory strikes on the basis of unemployment should therefore be considered suspect.

[41] Majority op., ¶ 74 ("In this case the record shows that the prosecutor had done research about Bell, which stands in stark contrast to the prosecutor in *Walker* who struck the only African-American without knowing anything about the juror.").

It is worth noting that the circuit court, in its postconviction order, also commended the prosecutor for doing "her

806

¶ 121. The heart of the *Batson* inquiry in this case, in my opinion, is the role that race played in the prosecutor's decision to seek out a police report for Bell and not for any other member of the venire. Why was Bell not treated the same as other venire members?[42]

¶ 122. The record makes clear that the prosecutor was well aware of Bell's race in advance of voir dire. Any citizen who is placed on a venire in Wisconsin must fill out a juror questionnaire. The juror questionnaire is required by law to include the race of the prospective juror as well as the address and occupation of each person.[43] The logical inference to be drawn from the record is that the prosecutor here had access to infor-

---

homework on Mr. Bell." The majority does not give any deference to the post-conviction order in this case, contrary to the State's request. I agree that the post-conviction decision is entitled to no deference here as it did not take any new evidence or establish any new facts.

[42] At the *Batson* hearing, the prosecutor stated that she did not ask Bell individual questions about the police report during voir dire because she did "not want to appear as though [she] was singling him out under the circumstances." The circuit court accepted this explanation without hesitation. The majority goes so far as to sympathize with the predicament in which the prosecutor found herself—accused of discrimination if she did not ask Bell individualized questions and accused of discrimination if she did. Majority op., ¶ 89. What neither the circuit court nor the majority appreciates is that the prosecutor had already singled out Bell when she obtained and used the police report during voir dire.

[43] *See* Wis. Stat. § 756.04(6); Legislative Council Comments, 1991, Wis. Stat. Ann. § 756.04 (West 2001). The questionnaire must also include "information necessary to determine if the person is qualified to serve as a juror in that circuit court" and "the prospective juror's declaration that the responses are true to the best of his or her knowledge," and "may request other information that the court needs to manage the

mation from this questionnaire, for she knew both that Bell would be in the venire and what his address was when she requested the police report the day before jury selection.[44]

¶ 123. In addition, the prosecutor anticipated that her peremptory strikes were going to be challenged and made arrangements before jury selection to have the challenge addressed outside of the presence of the venire. Prior to jury selection, when all parties were in chambers, the prosecutor made a special request that "if there is any objection to strikes of either party we either do it at the bench or in chambers." The court then clarified, "[Y]ou mean your peremptories?" The prosecutor responded, "Yes."

¶ 124. The prosecutor gave some indication of why she obtained the police report for Bell. In response to the circuit court's inquiry into whether she had a reason for striking Bell, the prosecutor responded:

> Yes, your honor. As the court is probably well aware, our office as well as the federal prosecutor, has prosecuted a number of Bells who live in Beloit throughout the years. It's well known as a criminal name in Beloit. I would also note that he lives at 1216 Wisconsin

---

jury system in an efficient manner, including information ordinarily sought during voir dire examination." Wis. Stat. § 756.04(6)(a), (c), (7).

[44] *See also State v. Tucker,* 2003 WI 12, ¶ 45, 259 Wis. 2d 484, 657 N.W.2d 374 (stating that despite restrictions on public access to juror information during jury selection, each party had access to juror questionnaires and therefore the restricted juror information); *State v. Britt,* 203 Wis. 2d 25, 33, 553 N.W.2d 528 (Ct. App. 1996) (same).

During the *Batson* hearing, the prosecutor also admitted that she knew from Bell's "juror card" that his employment varied.

Avenue which is a high crime area in Beloit. Um, I also yesterday had the Beloit Police Department run information on the 1216 Wisconsin address.

The inference to be drawn is that the prosecutor saw the name "Bell" and noted where he lived.[45]

¶ 125. On its face, this would be a race-neutral explanation. Yet it is not so clear that race is uninvolved. Would the prosecutor have run a police check on Bell if his juror questionnaire identified him as Asian, Latino, or Caucasian? Familial relationship to people involved in the criminal justice system alone may not be the linchpin here.

¶ 126. For example, the record also reveals that one of the members of the venire was a man with the last name Gregory. The prosecutor's office in Beloit was prosecuting a man named Gregory at the same time that the defendant here was being prosecuted.[46] The likelihood of a relationship between the two people named Gregory was greater than the likelihood of a relationship between Bell and the criminal Bell family since the telephone directory lists 14 people named Gregory but 54 named Bell.[47] Both venire member Bell

---

[45] "As study after study has showed, residence, especially in urban centers, can be the most accurate predictor of race—more accurate, indeed, than social class." *United States v. Bishop,* 959 F.2d 820, 828 (9th Cir. 1992).

[46] It is realistic to believe that the prosecutor in this case knew of the prosecution of Gregory since she was in contact with the prosecutor of the Gregory case. Jury selection in the Gregory trial began the day after jury selection in this case, and as mentioned above, Bell was also on the venire in the Gregory case. The prosecutor in this case passed along her police report to the prosecutor in the Gregory case prior to voir dire, which resulted in Bell's being struck for the second day in a row.

[47] *See* SBC Janesville Area Smart Yellow Pages (April 2003).

and the criminal Bells are African-American; the venire member Gregory, however, is not African-American, while the Gregory who was prosecuted is African-American. The prosecutor thus made the assumption of familial relation based on race, not just name. Yet numerous families have members of different races, including those of three of the seven justices on this court (my own included), as well as that of the governor of the state.

¶ 127. The circuit court did not engage in the inquiry required under step three of *Batson* and, as a result, the circuit court never noticed that Bell was treated differently than all other jurors on the venire and it never noticed the role that race played in the prosecutor's decision to treat Bell differently. As has been shown, a reasonable inference can be drawn from the totality of the circumstances in the present case that there was disparate treatment of venire member Bell based on race.

## V

¶ 128. The ultimate burden of proving discrimination in a *Batson* challenge rests with the defendant. The defendant in the present case did not raise many of the above arguments during the *Batson* hearing, making it difficult to conclude here that the circuit court's decision to uphold the peremptory strike of Bell is clearly erroneous. Nevertheless, the circuit court has a duty to explore all of the relevant facts and make a finding about discrimination. "*Batson* requires a trial judge to ensure that a defendant on trial is afforded the equal protection of the law."[48] The circuit court here

---

[48] *Jordan,* 206 F.3d at 201.

failed to meaningfully take on this duty. Moreover, the majority has neglected to enforce this duty.

¶ 129. Under similar circumstances, appellate courts remand the matter to the trial court.[49] I would remand this case to the circuit court to conduct a new hearing and engage in the analysis required at the third step of the *Batson* inquiry, including consideration of such matters as whether the prosecutor ran police checks on the addresses of any other potential jurors; whether any other potential jurors shared a name with an individual prosecuted by the Beloit District Attorney's office; and whether any other potential jurors indicated that they were unemployed or that their employment varied. If the circuit court determines, after the hearing, that there was no purposeful discrimination based on race, the conviction should be affirmed. If it determines that there was purposeful discrimination, the required remedy would be a reversal of the conviction and a new trial.

¶ 130. For the foregoing reasons, I dissent.

¶ 131. ANN WALSH BRADLEY, J.*(dissenting)*. For the reasons set forth in Parts I and II of Chief Justice Abrahamson's dissent, I agree that the majority's *Batson* analysis is flawed and that it erroneously concludes that the third step of *Batson* was satisfied in this case. I therefore join those parts of that dissent. I write separately, however, because I disagree with portions of the analysis in Parts III and IV of her dissent.

¶ 132. The majority correctly states that "this case concerns the third step of the *Batson* test." Majority op., ¶ 73. It also correctly notes that, under the

---

[49] *See State v. Gregory,* 2001 WI App 107, ¶ 30, 244 Wis. 2d 65, 630 N.W.2d 711 (Vergeront, J., dissenting); *see also Jordan,* 206 F.3d at 201; *Coulter,* 155 F.3d at 922.

third step of *Batson,* the circuit court "has the duty to weigh the credibility of the testimony and determine whether purposeful discrimination has been established." Majority op., ¶ 32. However, the majority's analysis essentially treats this duty as nonexistent and seems to indicate that the circuit court's role can be limited to determining that the reasons proffered by the prosecutor are race neutral.

¶ 133. The majority ignores the circuit court's proper role by focusing its step three analysis on confirming that the State advanced race neutral reasons, which is step two of *Batson.* The Chief Justice's dissent characterizes the majority's approach as "conflating the second and third steps of the *Batson* analysis." Chief Justice Abrahamson's Dissent, ¶ 102. Further, her dissent concludes that, as a result of the conflation, the majority errs "by concluding that the State's satisfaction of step two is sufficient, in and of itself, to defeat a charge of purposeful discrimination." *Id.*

¶ 134. I agree with these criticisms of the majority's step three analysis. By conflating step three into step two, the majority fundamentally undermines an important part of the process established by *Batson* to address discrimination in the jury selection process —namely, the circuit court's role in evaluating the evidence to determine whether purposeful discrimination has occurred. I therefore agree with the conclusions set forth in Part I of the Chief Justice's dissent.

¶ 135. I also agree that this record is insufficient for us to evaluate whether the circuit court properly engaged in the analysis required by step three of *Batson.* It is unclear whether the circuit court weighed the credibility of the testimony and made a determination that purposeful discrimination had not been estab-

812

lished. The court made no findings of fact. All that is set forth in the record is the court's conclusory statement: "Well, I think the State has made its case and it does have just cause to strike." Even the majority acknowledges that the circuit court did not elaborate on this conclusion. Majority op., ¶ 16. I therefore agree with the conclusions set forth in Part II of the Chief Justice's dissent.

¶ 136. However, I part ways with the Chief Justice with regard to portions of Parts III and IV of her dissent. *Batson* clearly places a duty on the circuit court to evaluate all evidence presented by the parties that is relevant to whether purposeful discrimination has occurred. However, I am not convinced that *Batson* requires an independent inquiry by the circuit court to the extent suggested in Part III or that the required analysis is as extensive as set forth in Part IV.

¶ 137. While it is certainly within the circuit court's discretionary authority to take the initiative in developing evidence of discrimination, the court is not required to do so. It is the defendant's, not the circuit court's, burden of persuasion with respect to the issue of purposeful discrimination. *See State v. Walker,* 154 Wis. 2d 158, 176, 453 N.W.2d 127 (1990). Likewise, I do not think a *Batson* hearing necessarily requires an inquiry to the extent detailed in the Chief Justice's dissent.

¶ 138. I would remand to the circuit court to engage in the analysis required to satisfy step three of *Batson.* If the court determined that there was no purposeful discrimination, it would affirm the conviction. If the court determined that there was purposeful discrimination, the proper remedy would be a reversal of the conviction and a new trial. In either event, the

circuit court must articulate its analysis on the record. Accordingly, I respectfully dissent.

¶ 139. I am authorized to state that JUSTICE DIANE S. SYKES joins this dissent.